Eric Lechtzin (SBN 248958)
EDELSON LECHTZIN, LLP
411 S. State Street, Suite N 300
Newtown, Pennsylvania 18940
Telephone: (215) 867-2399
elechtzin@edelson-law.com

*Attorneys for Plaintiffs and all others similarly situated*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NICKY PERROW and KOUSHALRAM KUMARAN, derivatively on behalf of BEYOND MEAT, INC., <br><br> Plaintiffs, <br><br> v. <br><br> ETHAN BROWN, LUBI KUTUA, NANDITA BAKHSHI, SETH GOLDMAN, CHELSEA A. GRAYSON, COLLEEN JAY, C. JAMES KOCH, RAYMOND J. LANE, JOSHUA M. MURRAY, and KATHY N. WALLER, <br><br> Defendants, <br><br> and <br><br> BEYOND MEAT, INC., <br><br> Nominal Defendant. | Case No.: 2:26-cv-6086 <br><br> **DEMAND FOR JURY TRIAL** <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |

This Complaint alleges the directors and/or officers of Beyond Meat, Inc. ("Beyond Meat" or the "Company") breached their fiduciary duties, were unjustly enriched, grossly mismanaged the Company, and committed violations of Sections 14(a) and 20 of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiffs

1
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Nicky Perrow ("Perrow") and Koushalram Kumaran ("Kumaran") (collectively "Plaintiffs"), by and through Plaintiffs' undersigned counsel, derivatively on behalf of Nominal Defendant Beyond Meat, allege upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters, based upon, among other things, Plaintiffs' counsel's investigations, which included, among other things, a review of Securities and Exchange ("SEC") filings, news reports, press releases, and other publicly available documents regarding Beyond Meat. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by Beyond Meat's directors and certain officers and is brought by Plaintiffs on behalf of Beyond Meat against Defendants Ethan Brown ("Brown"), Lubi Kutua ("Kutua"), Nandita Bakhshi ("Bakhshi"), Seth Goldman ("Goldman"), Chelsea A. Grayson ("Grayson"), Colleen Jay ("Jay"), C. James Koch ("Koch"), Raymond J. Lane ("Lane"), Joshua M. Murray ("Murray"), and Kathy N. Waller ("Waller") (collectively "Individual Defendants") resulting from the breach of fiduciary duties owed by Defendants to Beyond Meat and its shareholders during the Relevant Period from February 27, 2025 to the present, both dates inclusive (the "Relevant Period"). Plaintiffs are, and were at all times relevant times, hereto, Beyond Meat shareholders whose interests align with all other shareholders during the Relevant Period.

2. Beyond Meat is a plant-based meat company whose products are available in over 190,000 grocery stores, restaurants, hotels, and universities in over 80 countries worldwide. Beyond Meats owns and leases multiple properties for production, warehousing, research and development, and other purposes in the United States and abroad.

3. Beginning in early 2025, if not before, the Company faced shrinking demand for its products, alongside higher debt and revenue losses. As a result, the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Company's goal has been to achieve operations with positive earnings before interest, taxes, depreciation and amortization ("EBITDA") by the end of the year 2026. This was highlighted in Beyond Meat's earnings call for the 2024 fourth quarter ("Q4") and full year ("FY") earnings call, where the Company's President, Chief Executive Officer, and founder, Defendant Brown, stated that the "EBITDA positive goal is a very important milestone, obviously, for the company… and I want everybody entirely focused on that."

4.      During the Relevant Period, the Individual Defendants reiterated their efforts to achieve positive EBITDA operations by the end of 2026, emphasizing that they were focused on operating expense reduction, gross margin expansion, and broader operational efficiency and optimization at the expense of other aspects of the Company's business, such as revenue growth.

5.      During that period, the Individual Defendants failed to disclose any need (potential or actual) for the Company to record significant asset impairment charges attributable to certain of its long-lived assets, including its property, plant, and equipment ("PP&E"), operating lease right of use ("ROU") assets, or prepaid lease costs. Defendants also failed to disclose that $14.1 million in "pre-paid expenses and other current assets" on its balance sheet were assets and not costs the Company failed to expense in connection with a transaction in which over $1 billion of the Company's debt was exchanged for equity (the "Exchange Transaction").

6.      During the Relevant Period, the Individual Defendants breached their fiduciary duty by willfully or recklessly making false and misleading statements and/or causing the Company to make false and misleading statements.

7.      Individual Defendants stated in the 2024 10-K dated March 4, 2025, "**The Company concluded that no long-lived assets were impaired during the fiscal years ended December 31, 2024, 2023 and 2022**." (Emphasis added).[1]

8.      From October 24 to March 31, 2026, the Company announced important

---

[1] Unless otherwise noted, all emphasis is added.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

negative news. First, there would be a material impairment charge related to several long-lived assets. Next, the Company announced that it would delay reporting its third-quarter 2025 financial results. The Company later disclosed that financial results for the third quarter 2025 included a "$77.4 million in non-cash impairment charges related to certain of the Company's long-lived assets." On November 11, 2025, during an earnings call Defendant Kutua announced that "[t]the total impairment amount of $77.4 million was … allocated to PP&E, operating lease ROU assets." On March 26, 2026, Defendants belatedly disclosed that the filing of its Annual Report on Form 10-K for the 2025 Fiscal Year would be delayed because the Company would disclose a second material weakness in its internal control over financial reporting. Finally, on March 31, 2026, after the close of trading, Defendants disclosed that Beyond Meat's quarterly financial statements for the first three fiscal quarters of 2025 contained misstatements, including that Defendants had misclassified $14.1 million in costs related to the Exchange Transaction as assets, not expenses.

9. From October 24 to November 11, 2025, as the truth was released to the public and the market, Beyond Meat stock reacted accordingly, falling from $2.83 per share at the close of business on October 23, 2025, to $1.22 on November 12, 2025. This represents a loss of over 56% of the Company's value from the close of business on October 23, 2025. Following Defendants' disclosure of their false statements in each of the first three quarters of 2025, Beyond Meat's stock price fell even further to close at $0.62 per share on April 1, 2026

10. During the Relevant Period, the Individual Defendants breached their fiduciary duties to the Company. The Individual Defendants either made or caused Beyond Meat to make false and misleading statements about its financial condition. The Individual Defendants either made or caused the Company to fail to disclose: (1) several of Beyond Meat's long-term assets had a book value that exceeded the fair market value of the assets; (2) the Company would very likely have to realize a substantial non-cash impairment charge because of the difference between the book

4
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

value of the long-term assets and the fair market value; (3) Beyond Meat would not be able to make its periodic filings with the SEC on a timely basis because of the need to record the impairment charge; and (4) the failure of Beyond Meat to maintain internal controls.

11.     The Individual Defendants did not correct, nor did Beyond Meat correct the false and misleading statements or the omissions of material facts, making them personally liable for the breach of their fiduciary duties.

12.     The Individual Defendants also allowed Beyond Meat to fail to maintain adequate internal controls while three Individual Defendants made significant insider trades for a combined personal total of approximately $243,172.

13.     The Individual Defendants' knowing or reckless behavior and breaches of their fiduciary duties have caused significant damage to Beyond Meat. Their misconduct has subjected Brown and Kutua to a federal securities fraud class action pending in the United States District Court for the Central District of California (the "Securities Class Action"). The Securities Class Action has caused Beyond Meat to incur millions of dollars in losses due to internal investigations, the loss of corporate assets, and the unjust enrichment of the Individual Defendants, who were either overcompensated by Beyond Meat or benefited from the illegal conduct. Beyond Meat has suffered substantial damages due to the Individual Defendants' knowing or reckless breaches of their fiduciary duties and other misconduct.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(l)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section l0(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)) promulgated thereunder. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

15. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

16. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

17. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiffs

18. Plaintiff Perrow is a current shareholder of Beyond Meat. Plaintiff has continuously held Beyond Meat common stock at all relevant times.

19. Plaintiff Kumaran is a current shareholder of Beyond Meat. Plaintiff has continuously held Beyond Meat common stock at all relevant times.

### Nominal Defendant Beyond Meat

20. Beyond Meat is a Delaware corporation with principal executive offices at 888 N. Douglas Street, Suite 100, El Segundo, California 90245. Beyond Meat's common stock trades on the Nasdaq Stock Market LLC ("Nasdaq") under the ticker symbol "BYND."

### Defendant Brown

21. Defendant Brown is the Company's founder and has served as the Company's President and CEO since its inception in 2009. Defendant Brown also served as a Company director from 2009 to October 15, 2025. During the 2025 fiscal year, Brown received total compensation of $29,846,850 from the Company.

22. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Brown made the following sales of Company common stock:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 2/28/2025 | 5,844 | $3.16 | $18,467 |
| 3/3/2025 | 21,013 | $3.08 | $64,720 |
| 3/12/2025 | 439 | $3.33 | $1,462 |
| 5/28/2025 | 1,392 | $3.03 | $4,218 |
| 6/2/2025 | 8,848 | $3.11 | $27,517 |
| 8/28/2025 | 1,975 | $2.54 | $5,017 |
| 9/2/2025 | 12,559 | $2.37 | $29,765 |

Thus, in total, before the fraud was exposed, he sold 52,070 shares of Company common stock on the basis of inside information, for which he received approximately $151,165 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

23.    The Schedule 14A the Company filed with the SEC on April 8, 2025 (the "2025 Proxy Statement") stated the following about Defendant Brown:

Ethan Brown is the Founder of Beyond Meat and has served as our President and Chief Executive Officer and as a member of our board of directors since our inception in 2009. He has served as a manager of the Planet Partnership, LLC, our joint venture with PepsiCo, Inc., since January 2021, and served as our Secretary from our inception to September 2018. Mr. Brown began his career with a focus on clean energy and the environment, including serving as an energy analyst for the National Governors' Center for Best Practices. He then joined Ballard Power Systems Inc. (NASDAQ: BLDP), a proton exchange membrane fuel cell company, being promoted from an entry-level manager to reporting directly to the Chief Executive Officer before leaving to found Beyond Meat.

Mr. Brown also created and opened a center for fuel reformation and has held several industry positions, including Vice Chairman of the Board at The National Hydrogen Association and Secretary of the United States Fuel Cell Council. He is on the board of the American Cancer Society's

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

CEO's Against Cancer (LA Chapter), is a Henry Crown Fellow at the Aspen Institute, was honored as part of The Independent' s Climate 100 for 2024, Inc.'s Best Led Companies 2021, The Bloomberg 50 for 2019 and Newsweek's Top Innovators of 2019, and, along with Beyond Meat, is the recipient of the United Nation's highest environmental accolade, Champion of the Earth (2018). Mr. Brown received an MBA degree from Columbia University, an MPP degree with a focus on Environment from the University of Maryland and a BA degree in History and Government from Connecticut College. We believe that Mr. Brown is qualified to serve on our board of directors due to his strategic vision for our company and his expertise in technology and business operations.

**Defendant Kutua**

24.    Defendant Kutua has served as the Company's CFO and Treasurer since October 2022. During the 2025 fiscal year, Kutua received total compensation of $7,803,706 from the Company.

25.    During the Relevant Period, while Beyond Meat's stock was artificially inflated and before the scheme was exposed, Defendant Kutua made the following sales of Beyond Meat common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 2/28/2025 | 1,515 | $3.16 | $4,787 |
| 3/3/2025 | 10,255 | $3.08 | $31,585 |
| 3/12/2025 | 27 | $3.33 | $90 |
| 3/17/2025 | 15 | $3.52 | $53 |
| 4/14/2025 | 1,205 | $2.70 | $3,254 |
| 5/28/2025 | 65 | $3.03 | $197 |
| 6/2/2025 | 3,543 | $3.11 | $11,019 |
| 6/16/2025 | 15 | $3.30 | $50 |
| 7/14/2025 | 1,205 | $3.46 | $4,169 |
| 8/28/2025 | 65 | $2.54 | $165 |
| 9/2/2025 | 3,544 | $2.37 | $8,399 |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Thus, in total, before the fraud was exposed, he sold 21,454 shares of Beyond Meat common stock on the basis of inside information, for which he received approximately $63,768 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

26.    The 2025 Proxy Statement stated the following about Defendant Kutua:

> Lubi Kutua has served as the company's Chief Financial Officer and Treasurer since October 2022. Mr. Kutua served as Vice President, FP&A and Investor Relations from January 2019 to October 2022. Before joining Beyond Meat, Mr. Kutua served as Vice President, Equity Research, with a focus on the packaged foods and agribusiness sectors, at Jefferies, LLC from August 2015 to January 2019. Prior to that, Mr. Kutua served as Associate-Analyst, Equity Research, also focusing on packaged foods and agribusiness, at KeyBanc Capital Markets. He began his career in financial services at Goldman Sachs, most recently serving as Associate, Divisional Management Reporting. Mr. Kutua received his BA degree in Mathematics and Physics from Hamilton College, and his MBA degree from The New York University Leonard N. Stern School of Business.

**Defendant Bakhshi**

27.    Defendant Bakhshi served as a Company director from May 2024 until she resigned on October 15, 2025. Prior to her resignation, Defendant Bakhshi served as Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee.

28.    The 2025 Proxy Statement stated the following about Defendant Bakhshi:

> Nandita Bakhshi has served as a member of our board of directors since May 2024. Ms. Bakhshi served as Special Advisor to, and a current Board Member of, BMO Financial Corp. since February 2023. Ms. Bakhshi served as President and Chief Executive Officer of Bank of the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

West and as co-Chief Executive Officer of BNP Paribas USA, Inc. from March 2016 to February 2023. Ms. Bakhshi also served on the board of directors of each of Bank of the West and BNP Paribas USA, Inc. from March 2017 to February 2023, during which she served on each of their Risk Committees and Compensation/HR Committees. Ms. Bakhshi was Head of US Consumer Bank and Group Head of Direct Channels at TD Bank from March 2009 to February 2016, Head of Products and Payments at Washington Mutual from March 2006 to September 2008, and Head of Mobile Commerce at First Data from March 2004 to March 2005.

Ms. Bakhshi has been a member of the board of directors of Quaker Chemical Corporation, doing business as Quaker Houghton (NYSE: KWR), a global leader in industrial process fluids, since July 2024 and currently serves on its Audit Committee and Sustainability Committee. Ms. Bakhshi has been a member of the board of directors of Grameen America, Inc., a non-profit microfinance institution, since March 2020 and currently serves on its Audit Committee. Ms. Bakhshi served on the board of directors of the Whitaker Peace & Development Initiative from March 2020 to February 2023 and is a Board Member Emeritus of the US-India Strategic Partnership Forum.

Ms. Bakhshi received an MA degree in international relations from Jadavpur University and a BA degree in history from the University of Calcutta. We believe that Ms. Bakhshi is qualified to serve on our board of directors due to her diversified financial industry background and leadership experience.

**Defendant Goldman**

29.    Defendant Goldman has served as a Company director since February 2013 and has served as Chairman of the Board since February 27, 2020. Defendant Goldman previously served as the Company's Executive Chairman of the Board from October 2015 to February 27, 2020. Defendant Goldman also currently serves as a member of the Nominating and Corporate Governance Committee.

30.    The 2025 Proxy Statement stated the following about Defendant Goldman:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Seth Goldman has served as a member of our board of directors since February 2013. Mr. Goldman served as Executive Chair of Beyond Meat from October 2015 through February 2020. Mr. Goldman co-founded Eat the Change, Inc., a plant-based snack food and organic tea company under the brand Just Ice Tea®, and has served as its Chief Executive Officer since March 2020. He is also a Co-Founder of PLNT Management, Inc., which operates PLNT Burger®, a plant-based quick-serve restaurant chain, and has served as its Board Chair since 2021. Mr. Goldman has been the Chair of Mission Guardians for Tony's Chocolonely, a Certified B Corporation and impact company that makes chocolate and fights for equality in the chocolate industry, since that position was established in May 2023. Mr. Goldman has been a member of the Maryland Economic Development Commission since April 2023. Mr. Goldman was the TeaEO Emeritus and Innovation Catalyst 2 for The Coca-Cola Company's Venturing & Emerging Brands, a part-time position he held from November 2015 through December 2019. Mr. Goldman co-founded Honest Tea Inc., a bottled organic tea company, in February 1998, which was later sold to The Coca-Cola Company, and previously served as Honest Tea's President and TeaEO until 2015.

In 2022, Mr. Goldman was named Person of the Year by BevNet Magazine, and in 2015 he was named the #1 Disruptor by Beverage World and Beverage Executive of the Year by Beverage Industry magazine. He has also been recognized as an Ernst & Young Entrepreneur of the Year and by the Washington Business Hall of Fame. In 2018, Partnership for a Healthier America recognized Mr. Goldman with its Visionary CEO award. Mr. Goldman is a co-Chair of the Yale School of Management's Entrepreneurship Advisory Board and, since January 2008, has served on the board of directors of Bethesda Green, a sustainability non-profit he co-founded in Bethesda, Maryland. He also served on the board of directors of Ripple Foods, a dairy-free plant-based milk company, from November 2015 to October 2020, the advisory board of the American Beverage Association from 2013 to 2019 and the Yale School of Management from July 2013 to March 2020. Mr. Goldman has demonstrated his commitment to boardroom excellence as a Board Leadership Fellow with the National Association of Corporate Directors.

Mr. Goldman received a BA degree in Government from Harvard College and an MPPM degree from Yale School of Management and is

a Henry Crown Fellow at the Aspen Institute. We believe that Mr. Goldman is qualified to serve on our board of directors due to his extensive experience working at fast-growing brands in the food and beverage industry, his experience founding and building entrepreneurial companies, and his knowledge of sustainable business practices.

**Defendant Grayson**

31. Defendant Grayson has served as a Company director since May 2024. Defendant Grayson also currently serves as the Chair of the Risk Committee and as a member of the Nominating and Corporate Governance Committee.

32. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Grayson made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 3/13/2025 | 3,330 | $3.29 | $10,956 |
| 3/25/2025 | 1,110 | $3.28 | $3,641 |
| 4/25/2025 | 1,125 | $2.54 | $2,858 |
| 5/28/2025 | 1,125 | $3.11 | $3,499 |
| 6/25/2025 | 492 | $3.50 | $1,722 |
| 7/25/2025 | 492 | $3.85 | $1,894 |
| 8/26/2025 | 492 | $2.60 | $1,279 |
| 9/25/2025 | 492 | $2.86 | $1,407 |
| 10/27/2025 | 492 | $2.00 | $984 |

Thus, in total, before the fraud was exposed, she sold 9,150 shares of Company common stock on the basis of inside information, for which she received approximately $28,239 in proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatement and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

33. The 2025 Proxy Statement stated the following about Defendant

Grayson:

Chelsea A. Grayson has served as a member of our board of directors since May 2024. Ms. Grayson served as an Executive-in-Residence at Wunderkind Corporation (formerly BounceX), a behavioral automation software and analytics company, from March 2020 to January 2024. From November 2022 to July 2023, Ms. Grayson served as CEO of Spark Networks SE (OTC: LOVLY; formerly NASDAQ: LOY), a global dating company with a portfolio of brands (including Zoosk, Elite Singles, Silver Singles, Christian Mingle and JDate/JSwipe), and from August 2020 to July 2023, as a member of its board of directors. From October 2018 to December 2019, Ms. Grayson served as CEO, and from October 2017 to December 2019, as a member of the board of directors, of True Religion, Inc. (formerly NASDAQ: TRLG), a global denim and streetwear company based in Los Angeles. From December 2014 to December 2017, Ms. Grayson was at American Apparel Inc. (formerly NYSE: APP), a global vertically integrated apparel manufacturer, retailer and wholesaler based in Los Angeles, where she first joined as General Counsel, Chief Administrative Officer and Executive Vice President, and then served as CEO and as a member of the board of directors. Prior to American Apparel, Inc. she was a partner in the M&A/Corporate Governance practice groups at Loeb & Loeb LLP and Jones Day.

Ms. Grayson has been a member of the board of directors of Xponential Fitness, Inc. (NYSE: XPOF), a leading franchisor of boutique fitness and wellness brands (including Rumble, StretchLab, Club Pilates, YogaSix, CycleBar, Pure Barre, AKT, BFT and Lindora) since October 2021, where she currently is the Chair of the Nominating and Corporate Governance Committee and is a member of the Audit Committee and the Human Capital Management Committee. She has also served on the board of directors of Bedrock Manufacturing Company, owner of the Shinola Detroit and Filson brands, since February 2025, and on the board of directors of The Sunrider Corporation, doing business as Sunrider International, a manufacturing, direct selling and retail sales company in the nutraceutical space, since January 2025. Among other past board positions, Ms. Grayson was a member of the board of directors of Goodness Growth Holdings Inc. (CSE: GDNS) from February 2019 to May 2023; Morphe Cosmetics (Forma Brands) from September 2022 to May 2023; iHerb from June 2021 to June 2022; Precision Surfacing Solutions (Lapmaster Group

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Holdings) from April 2021 to October 2022; LoudPack from December 2020 to March 2022; Sugarfina from January 2019 to December 2020; and Delta Dental from January 2017 to December 2019. Ms. Grayson has been a member of the UCLA Board of Visitors in the English Department since January 2018. Ms. Grayson has demonstrated her commitment to boardroom excellence as a Board Leadership Fellow with the National Association of Corporate Directors. Ms. Grayson's experience at Spark Networks SE, True Religion, Inc. and American Apparel Inc. included executive officer experience prior to or during the time those companies were involved in Chapter 11 bankruptcy reorganization proceedings.

Ms. Grayson received a JD degree, Order of the Coif, from Loyola Law School, and a BA degree in English Literature and Business/Economics from the University of California, Los Angeles. We believe that Ms. Grayson is qualified to serve on our board of directors due to her extensive leadership, corporate governance and public company experience.

### Defendant Jay

34. Defendant Jay has served as a Company director since May 2022. Defendant Jay currently serves as the Chair of the Human Capital Management and Compensation Committee and as a member of the Risk Committee.

35. The 2025 Proxy Statement stated the following about Defendant Jay:

Colleen Jay has served as a member of our board of directors since May 2022. Ms. Jay retired from The Procter & Gamble Company (NYSE: PG) in October 2017 after 32 years of service, most recently as Global Division President from 2015. Ms. Jay joined The Procter & Gamble Company in 1985 where she managed top brand portfolios and large multi-billion-dollar businesses across multiple categories and geographies, including successfully leading a complex transition and divestiture of several businesses and leading operational units in the United States, Canada, China, and multiple global businesses from Switzerland during the course of her extensive career. From 2010 to 2012, Ms. Jay served as President, Global Female Beauty. From 2012 to 2015, Ms. Jay served as President, Global Retail Hair Care and Color.

Ms. Jay has been a member of the board of directors of Treasury Wine

Estates Limited (ASX: TWE) since April 2018, and currently serves on its Human Resources Committee and Wine Operations and Sustainability Committee and was previously on its Audit and Risk Committee. Ms. Jay has been a member of the board of directors of The Cooper Companies, Inc. (NASDAQ: COO) since April 2016 and currently serves as Chair of its Organization and Compensation Committee and as a member of its Corporate Governance and Nominating Committee. Ms. Jay has also worked closely with Catalyst, Inc., a non-profit organization dedicated to improving workplace inclusion for women. She received a BBA degree in Business from Wilfrid Laurier University. We believe that Ms. Jay is qualified to serve on our board of directors due to her extensive experience working in the consumer products industry at a leading public company and her experience on other public company boards of directors.

**Defendant Koch**

36.     Defendant Koch has served as a Company director since May 2023 and currently serves as a member of the Risk Committee.

37.     The 2025 Proxy Statement stated the following about Defendant Koch:

C. James Koch has served as a member of our board of directors since May 2023. Mr. Koch founded The Boston Beer Company, Inc. (NYSE: SAM), a producer of alcohol beverages, in 1984, has been its Chairman since 1995 and also served as its Chief Executive Officer until January 2001. Prior to starting The Boston Beer Company, Inc., he worked as a consultant for an international consulting firm with a focus on manufacturing.

Mr. Koch received a BA degree in Government from Harvard College, an MBA degree from Harvard Business School and a JD degree from Harvard Law School. We believe that Mr. Koch is qualified to serve on our board of directors due to his experience founding and building a public craft brewing company, and his skills in strategy, brand development and industry leadership.

**Defendant Lane**

38.     Defendant Lane has served as a Company director since February 2015 and currently serves as a member of the Human Capital Management and

Compensation Committee.

39.    The 2025 Proxy Statement stated the following about Defendant Lane:

Raymond J. Lane has served as a member of our board of directors since February 2015. Mr. Lane has been a Managing Partner at GreatPoint Ventures, a venture capital firm, since March 2015. Mr. Lane served as Partner Emeritus and Advisor of Kleiner, Perkins, Caufield & Byers LLC (Kleiner Perkins), a venture capital firm, from April 2013 to December 2019, after having previously served as one of its Managing Partners from September 2000 to November 2014. Mr. Lane has been a member of the board of directors of Hewlett Packard Enterprise Company (NYSE: HPE) since 2015 and currently serves on its Technology Committee and Finance and Investment Committee. In addition, Mr. Lane previously served as executive Chairman of Hewlett-Packard Company from September 2011 to April 2013 and as non-executive Chairman of Hewlett-Packard Company from November 2010 to September 2011.

Prior to joining Kleiner Perkins, Mr. Lane was President and Chief Operating Officer and a director of Oracle Corporation (NYSE: ORCL), a software company. Mr. Lane has served on the Board of Trustees of Carnegie Mellon University, including as Chairman of the Board from July 2009 to July 2015, as an Emeritus Trustee since July 2022, and currently serves on the Executive Committee. He also serves on the board of directors of Special Olympics International. Mr. Lane received a BS degree in Mathematics and an honorary PhD in Science from West Virginia University. We believe that Mr. Lane is qualified to serve on our board of directors due to his experience working with entrepreneurial companies and on other public company boards of directors.

**Defendant Murray**

40.    Defendant Murray has served as a Company director since May 2024. Defendant Murray currently serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee.

41.    The 2025 Proxy Statement stated the following about Defendant Murray:

Joshua M. Murray has served as a member of our board of directors since May 2024. Mr. Murray is currently Chief Financial Officer and Head of Strategy at Orea Biosystems, Inc., a privately held biotechnology company developing allogeneic cell therapies in blood, immune and genetic diseases, and has served in this position since April 2021. Prior to joining Orea Biosystems, Inc., Mr. Murray held various positions at Goldman Sachs & Co. from July 2006 to April 2021, most recently as a Managing Director and Head of West Coast Healthcare Capital Markets, where he advised a wide array of biotechnology and life sciences companies.

16
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Mr. Murray has served as a member of the board of directors of Corcept Therapeutics Incorporated (NASDAQ: CORT), a commercial-stage company engaged in the discovery and development of medications to treat severe endocrinologic, oncologic, metabolic and neurologic disorders by modulating the effects of the hormone cortisol, since June 2021, and currently serves on its Audit Committee.

Mr. Murray received an AB degree, with University Honors, in History and Economics from Harvard College. We believe that Mr. Murray is qualified to serve on our board of directors due to his experience in corporate finance and his experience on another public company board of directors.

**Defendant Waller**

42.     Defendant Waller has served as a Company director since November 2018. Defendant Waller currently serves as the Chair of the Audit Committee and as a member of the Human Capital Management and Compensation Committee.

43.     The 2025 Proxy Statement notes that Defendant Waller is the Company's lead independent director. The 2025 Proxy Statement stated the following about Defendant Waller:

Kathy N. Waller has served as a member of our board of directors since November 2018. Ms. Waller retired from The Coca-Cola Company (NYSE: KO) in March 2019 after more than 30 years of service, most recently as Executive Vice President, Chief Financial Officer and President, Enabling Services prior to her retirement. Ms. Waller joined The Coca-Cola Company in 1987 as a senior accountant in the Accounting Research Department and served in a number of accounting and finance roles of increasing responsibility. From July 2004 to August 2009, Ms. Waller served as Chief of Internal Audit. In December 2005, she was elected Vice President of The Coca-Cola Company, and in August 2009, she was elected Controller. In August 2013, she became Vice President, Finance and Controller, assuming additional responsibilities for corporate treasury, corporate tax and finance capabilities, and served in that position until April 2014, when she was appointed Chief Financial Officer and elected Executive Vice President. Ms. Waller assumed expanded responsibility for The Coca-Cola Company's strategic governance areas when she was appointed President, Enabling Services, on May 1, 2017.

Ms. Waller has been a member of the board of directors of Delta Air Lines, Inc. (NYSE: DAL) since July 2015, and currently serves as Chair of its Audit Committee and as a member of its Corporate Governance Committee and Personnel & Compensation Committee. Ms. Waller has been a member of the board of directors of CGI Inc. (NYSE: GIB), a leading IT and business consulting services firm, since December 2018 and currently serves as Chair of its Audit and Risk Management Committee. Ms. Waller has also been an executive mentor with the ExCo

Group, a global firm of executive mentors, since 2021. Previously she served on the board of directors of Cadence Bank (NYSE: CADE), Coca-Cola FEMSA, S.A.B. de C.V and Monster Beverage Corporation. In addition, she is currently a member of the Board of Trustees of the University of Rochester, Spelman College, the Woodruff Arts Center, where she also serves as Treasurer and Finance Committee Chair, and the Atlanta History Center, and is a Director at Large for the Girl Scouts of Greater Atlanta. In February 2022, Ms. Waller was appointed Executive Director of the Atlanta Committee for Progress, a public/private partnership between the city's top business, civic and academic leaders, and the Mayor of Atlanta. Ms. Waller received a BA degree in History from the University of Rochester and an MBA degree in Accounting and Finance from the Simon Business School at the University of Rochester. We believe that Ms. Waller is qualified to serve on our board of directors due to her more than 30 years of experience in accounting and finance at a major public company and her experience on other public company boards of directors.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

44. By reason of their positions as officers, directors, and/or fiduciaries of Beyond Meat and because of their ability to oversee, direct, and control the business and corporate affairs of Beyond Meat, the Individual Defendants owed Beyond Meat and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Beyond Meat in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Beyond Meat and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

45. Each director and officer of the Company owes to Beyond Meat and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

46. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Beyond Meat, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

47. To discharge their duties, the officers and directors of Beyond Meat were required to exercise reasonable and prudent supervision over the management,

policies, controls, and operations of the Company.

48.    Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Beyond Meat, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders, which the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants, who were also the officers and directors of the Company, has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

49.    As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on Nasdaq, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

50.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the

officers and directors of Beyond Meat were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Beyond Meat's Code of Business Conduct and Ethics (the "Code of Ethics");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Beyond Meat conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Beyond Meat and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Beyond Meat's operations would comply with all applicable laws and Beyond Meat's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other

financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

51.    Each of the Individual Defendants further owed to Beyond Meat and its shareholders the duty of loyalty requiring that each favor Beyond Meat's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

52.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Beyond Meat and were at all times acting within the course and scope of such agency.

53.    Because of their advisory, executive, managerial, directorial, and controlling positions with Beyond Meat, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

54.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Beyond Meat.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

55.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

56.    The purpose and effect of the conspiracy, common enterprise, and common course of conduct were, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust

enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

57. The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Beyond Meat was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

58. Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

59. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Beyond Meat and was at all times acting within the course and scope of such agency.

## **BEYOND MEAT'S CODE OF ETHICS**

60. Beyond Meat's Code of Ethics states that it has been adopted "[a]s part of th[e] [Company's] commitment to "promoting high standards of honest and ethical business conduct and compliance with applicable laws, rules and regulations." The Code of Ethics also states that it "provide[s] guidance applicable to all members of the Company's Board of Directors (the "Board") and officers, employees, independent contractors and consultants of the Company."

61.     In a section titled "Obey the Law," under the subsection "Legal Compliance," the Code of Ethics states the following:

> Directors and employees must follow all applicable laws, rules and regulations of each of the countries where the Company operates while performing their duties to the Company. The Company's success depends upon each employee operating within legal guidelines and cooperating with authorities. It is essential that all employees know and understand the legal and regulatory requirements that apply to the Company's business and to their specific area of responsibility. While an employee is not expected to have complete mastery of these laws, rules and regulations, employees are expected to be able to recognize situations that require consultation with others to determine the appropriate course of action. If a provision of this Code conflicts with any local law or regulation where an employee is based, the more restrictive requirement applies. See Section 19 (Compliance Standards and Procedures) for a description of whom to contact with questions about legal compliance.

62.     In the section titled "Obey the Law," under the subsection "Insider Trading," the Code of Ethics states the following, in relevant part:

> Every director and employee is prohibited from using "inside" or material nonpublic information about the Company, or about companies with which the Company does business, in connection with buying or selling the Company's or such other companies' securities, including "tipping" others who might make an investment decision on the basis of this information. It is illegal, and it is a violation of this Code, the Company's Insider Trading Policy (the "Insider Trading Policy") and other Company policies, to tip or to trade on inside information. Employees who have access to inside information are not permitted to use or share that inside information for stock trading purposes or for any other purpose except to conduct Company business.
>
> Employees must exercise the utmost care when in possession of material nonpublic information. The Insider Trading Policy provides guidance on the types of information that might be nonpublic and material for these purposes, and guidelines on when and how an employee may purchase or sell shares of Company stock or other Company securities.

63.     In a section titled "Ethical Obligations," under the subsection "Conflicts of Interest," the Code of Ethics states the following, in relevant part:

> Employees are expected to avoid actual or apparent conflicts of interest between their personal and professional relationships. For directors, this may include recusal from discussions of the Board when their participation could be perceived as creating such a conflict. A "conflict

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

of interest" occurs when a personal interest interferes in any way (or even appears or could reasonably be expected to interfere) with the interests of the Company as a whole. Sometimes conflicts of interest arise when an employee takes some action or has some outside interest, duty, responsibility or obligation that conflicts with an interest of the Company or the employee's duty to the Company. A conflict of interest can arise when an employee takes actions or has interests that may make it difficult to perform the employee's duties objectively and effectively. Conflicts of interest can also arise when an employee or relative of an employee (including a family member of an employee) receives improper personal benefits as a result of the employee's position at the Company. In evaluating whether an actual or contemplated activity may involve a conflict of interest, employees should consider:

- whether the activity would appear improper to an outsider;

- Whether the activity could interfere with an employee's job performance or morale or that of another Company employee;

- whether the employee has access to confidential Company information or influence over significant Company resources or decisions;

- the potential impact of the activity on the Company's business relationships, including relationships with business partners and service providers;

- the extent to which the activity could benefit the employee or the employee's relatives, directly or indirectly;

- any overlap between the employee's specific role at the Company; and

- whether the investment is in a publicly traded or non-publicly traded company.

64.    In the section titled "Ethical Obligations," under the subsection "Financial Integrity; Public Reporting," the Code of Ethics states, in relevant part:

The Company strives to maintain integrity of the Company's records and public disclosure. The Company's corporate and business records, including all supporting entries to the Company's books of account, must be completed honestly, accurately and understandably. The Company's records are important to investors and creditors. They serve as a basis for managing the Company's business and are important in meeting the Company's obligations to business partners, suppliers, vendors, creditors, employees and others with whom the Company does business. The Company depends on the books, records and accounts accurately and fairly reflecting, in reasonable detail, the Company's assets,

24
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities. To help ensure the integrity of the Company's records and public disclosure, the Company requires that:

- no entry be made in the Company's books and records that is intentionally false or misleading;
- transactions be supported by appropriate documentation;
- the terms of sales and other commercial transactions be reflected accurately in the documentation for those transactions and all such documentation be reflected accurately in the Company's books and records, and agreements may not include "side deals" or other off-the-books arrangements;
- employees comply with the Company's system of internal controls and be held accountable for their entries;
- any off-balance sheet arrangements of the Company are clearly and appropriately disclosed;
- employees work cooperatively with the Company's independent auditors in their review of the Company's financial statements and disclosure documents;
- no cash or other assets be maintained for any purpose in any unrecorded or "off-the-books" fund· and
- records be retained or destroyed according to the Company's document retention policies or procedures then in effect.

For clarity, the Company specifically prohibits:

- establishing or using any secret or off-balance sheet function or account for any purpose;
- using corporate funds to establish or use any bank account that is not identified by the name of the owner; and
- establishing or using any offshore corporate entity for any purpose other than a legitimate Company business purpose.

65. In the section titled "Confidentiality," the Code of Ethics states:

In carrying out the Company's business, Covered Parties may learn confidential or proprietary information about the Company, its customers, distributors, suppliers, or joint venture partners. Confidential or proprietary information includes all non-public information relating to the Company, or other companies, that would be harmful to the relevant company or useful or helpful to competitors if disclosed. Covered Parties must maintain the confidentiality of all information entrusted to them, except when disclosure is authorized or legally mandated.

66. In a section titled "Treat Others Inside and Outside of the Company Fairly and Honestly," under the subsection "Protection and Proper Use of Company Assets," the Code of Ethics states the following, in relevant part:

All employees are expected to protect the Company's assets and ensure their efficient use for legitimate business purposes. These assets include the Company's proprietary information, including intellectual property

25

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

such as trade secrets, patents, trademarks and copyrights, as well as business and marketing plans and manufacturing ideas, designs, databases, records and any nonpublic financial data or reports. Theft, carelessness and waste have a direct impact on the Company's business and operating results. The Company's physical property, such as computer equipment, buildings, furniture and furnishings, office supplies, products and inventories, should be used only for activities related to an employee's employment, although incidental personal use is permitted. The Company retains the right to access, review, monitor and disclose any information transmitted, received or stored using the Company's electronic equipment, with or without an employee's or third party's knowledge, consent or approval. Unauthorized use or distribution of the Company's proprietary information is prohibited. Any theft, misuse or suspected theft or misuse of the Company's assets that becomes known to an employee must be immediately reported.

67.   In a section titled "Administrative Matters," under the subsection "Amendment and Waiver," the Code of Ethics states:

Any amendment or waiver of this Code must be in writing and must be authorized by a majority of the members of the Board or, to the extent permissible under applicable laws, rules and regulations, a committee of the Board if the Board has delegated such authority to a committee. The Company will notify employees of any material changes to this Code. Any such amendment or waiver may be publicly disclosed if required by applicable laws, rules and regulations.

68.   In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including but not limited to, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Also, in violation of the Code of Ethics, the Individual Defendants failed to maintain the accuracy of Beyond Meat's records and reports, failed to maintain internal controls, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## BEYOND MEAT'S AUDIT COMMITTEE CHARTER

69.   The Company also maintains an Audit Committee Charter (the "Audit Committee Charter"). The Audit Committee Charter states that the purpose of the

Audit Committee is as follows:

> The purpose of the Audit Committee (the "Committee") of the board of directors (the "Board") of Beyond Meat, Inc., a Delaware corporation (the "Company"), is to: (A) assist the Board in overseeing (1) the integrity of the Company's financial statements, (2) the Company's compliance with legal and regulatory requirements, (3) the independent auditor's qualifications and independence, and (4) the performance of the Company's internal audit function and independent auditors; (B) provide such reports as may be required of an audit committee under the rules and regulations promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"); and (C) provide oversight with respect to ethical conduct and any related matters. The Committee is not responsible, however, for planning or conducting audits, or determining whether the Company's financial statements are complete and accurate or in accordance with generally accepted accounting principles ("GAAP").

70. In a section titled "Authority and Responsibilities," the Audit Committee Charter states that the Audit Committee will "[o]n behalf of the Board, oversee the principal financial risk exposures facing the Company and the Company's mitigation efforts in respect of such risks, including, but not limited to financial reporting risks and credit and liquidity risks."

71. In the same section, the Audit Committee Charter states that the Audit Committee will "[r]eview with management any significant changes to GAAP, SEC and other accounting policies or standards that will impact or could impact the financial reports under review[,]" as well as "[r]eview significant changes to the Company's accounting principles and practices proposed by the independent auditor or management." Moreover, in the same section the Audit Committee Charter states that the Audit Committee will "[r]eview significant changes to the Company's accounting principles and practices proposed by the independent auditor or management."

72. In the same section, the Audit Committee Charter states that the Audit Committee will:

> Recommend to the Board as to whether the Company's audited financial statements should be included in the Company's Annual Report on Form 10-K based on the Committee's review and discussions (a) with management of the audited financial statements, (b) with the independent

27

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

auditor of the matters required to be discussed by the PCAOB and the SEC and (c) with the independent auditor concerning the independent auditor's independence.

73.    In the same section, the Audit Committee Charter states that the Audit Committee will "[p]rovide a report in the Company's proxy statement in accordance with the rules and regulations of the SEC[,]" and "[p]eriodically receive reports from management regarding, and review and discuss the adequacy and effectiveness of, the Company's disclosure controls and procedures.

74.    In the same section, the Audit Committee Charter states that the Audit Committee will:

> Review and discuss with the independent auditor, management and internal audit staff or others responsible for the internal audit function (i) their periodic reviews of the adequacy of the Company's accounting and financial reporting processes and systems of internal       control, including any significant deficiencies and material weaknesses in their design or operation, and (ii) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls.

75.    In the same section, the Audit Committee Charter states that the Audit Committee will "[r]eview, prior to public release, the substance and presentation of financial information (including any guidance) in the Company's annual and quarterly earnings releases;" will "[d]iscuss with management and the independent auditor the quarterly financial statements prior to the filing of the Form 10-Q, including Management's Discussion and Analysis of Financial Condition and Results of Operations contained therein; provided that this responsibility may be delegated to the chairman of the Committee or a member of the Committee who is a financial expert;" and will "[e]stablish a procedure for receipt, retention and treatment of any complaints received by the Company about its accounting, internal accounting controls or auditing matters and for the confidential and anonymous submission by employees of concerns regarding questionable accounting or auditing matters."

87.    In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual

Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## **INDIVIDUAL DEFENDANTS' MISCONDUCT**

**Background**

76.     Beyond Meat is a California-based Delaware corporation whose primary operations surround the development and marketing of plant-based meat products.

77.     To accomplish its goals, the Company has established three product platforms to correspond with the global meat market: beef, poultry, and pork. The Company creates its products by using plant-derived amino acids, lipids, carbohydrates, trace minerals, and water to fabricate meat products from the molecular level. The main ingredient the Company uses to fabricate its products is pea protein, made available through a limited number of suppliers. Notably, the Company previously held a multi-year sales agreement with Roquette Freres pertaining to the supply of pea protein, which expired on December 31,2024.

78.     The Company has also promulgated a brand promise known as "Eat What You Love," which reflects the Company's stated belief that adopting plant-based meats can improve the following issues: climate change, human health, animal welfare, and constraints on natural resources.

79.     The Company states that its products do not include genetically modified organisms, added hormones, or added antibiotics. Moreover, the Company has stated that as of December 2024, all of its retail products in the United States were certified

Kosher and Halal.

80.   As of December 2024, the Company's products were available at roughly 129,000 retail and foodservice locations across over 65 countries globally. Moreover, as of December 31, 2024, the Company employed 754 individuals full-time as well as 54 contract workers.

81.   As noted above, the Company has faced declining demand for its products since the beginning of 2025. As such, immediately prior to and during the Relevant Period, the Individual Defendants prioritized achieving EBITDA-positive operations by the end of 2026.

82.   To accomplish the EBITDA-based goal, the Individual Defendants underlined the importance of reducing operating expenses, improving efficiency, and expanding gross margins. To this end, the Company's Board approved a plan on February 24, 2025, to reduce the Company's workforce in North America and the European Union by roughly 44 employees, or approximately 6% of the Company's total global workforce.

83.    Moreover, in 2025 the Company had debt of $1.142 billion which was coming due in less than two years. Knowing they had to get these Notes off their balance sheets, Defendants emphasized the accuracy of the Company's financial statements. Defendants did not disclose they anticipated needing to record significant asset impairment charges attributable to the Company's long-lived assets, including its PPE, ROU assets, or prepaid lease costs.

84.   On the basis on these statements as well as other statements, on September 29, 2025, Defendants announced that they had commenced the Exchange Transaction. As part of the announcement of the Exchange Transaction, Defendants also disclosed that 47% of holders of the 2027 Notes ("2027 Noteholders") had already agreed to participate.

85.   The Exchange Transaction provided that 2027 Noteholders could tender their 2027 Notes as part of an "early settlement" by October 10, 2025, with an October

30
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

28, 2025 deadline to tender 2027 Notes. Rights to withdraw tendered 2027 Notes and revoke consent terminated on October 10, 2025, however, and the Exchange Transaction was scheduled to settle on October 30, 2025.

86.     Nearly all 2027 Noteholders tendered their 2027 Notes prior to October 10, 2025. In a proxy dated October 17, 2025, Defendants disclosed that $1,114,603,000 in aggregate principal amount of the 2027 Notes was tendered as part of the early settlement process, "representing 96.92%" of Noteholders. Although the massive dilution of existing shareholders caused the Company's share price to fall 81.75% from $2.85 on September 26, 2025, the last trading day before the Exchange Transaction was announced, to only $0.52 cents on October 16, 2025, investors, sensing a bargain—and trusting Defendants' representations about the Company's accounting and balance sheet—rushed in to invest. The stock soared back to $3.62, and Beyond Meat was saved. Or so it appeared.

**Beyond Meat's Reporting Obligations as a Public Company**

87.     As set forth above and in more detail below, the Company is required to file regular financial reports with the SEC. The SEC requires that these reports conform to the standards set by the Financial Account Standards Board ("FASB"). FASB's standards are known collectively as Generally Accepted Accounting Principles("GAAP").

88.     GAAP constitutes the standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time, and are the common set of accounting principles, standards, and procedures that companies in the United States use to prepare their financial statements.

89.     The SEC Rules interpretive releases and the FASB Accounting Standards Codification ("ASC") represent sources of authoritative GAAP for SEC registrants. ASC 105-10-05-1.

90.     Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial

statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate despite footnote or other disclosures, unless the Commission has otherwise provided.

91. SEC rules and regulations require that publicly traded companies such as Beyond Meat include financial statements that comply with GAAP in their annual and quarterly reports filed with the SEC (see Sections 12 and 13 of the Exchange Act; Rule 10-01(d) of SEC Regulation S-X). Regulation S-X requires interim financial statements to also comply with GAAP (17 C.F.R. §210.10-01(a)).

92. FASB's Statements of Financial Accounting Concepts provide the framework for financial accounting. As stated in FASB's Statement of Financial Accounting Concepts No. 8 ("CON 8"), Chapter 1, "[t]he objective of general purpose financial reporting is to provide financial information about the reporting entity that is useful to existing and potential investors, lenders, and other creditors in making decisions about providing resources to the entity." CON 8, Ch. 1 ¶ OB2.

93. CON 8 states that "General purpose financial reports provide information about the financial position of a reporting entity, which is information about the entity's economic resources and the claims against the reporting entity. Financial reports also provide information about the effects of transactions and other events that change a reporting entity's economic resources and claims. Both types of information provide useful input for decisions about providing resources to an entity." CON 8, Ch. 1 ¶ OB12.

94. In order for the financial information to be useful, "it must be relevant and faithfully represent what it purports to represent." CON 8, Ch. 3 ¶ QC4. "Relevant financial information is capable of making a difference in the decisions made by users ... if it has predictive value, confirmatory value, or both." CON 8, Ch. 3 ¶¶ QC6–QC7. Faithful representation refers to a depiction of an economic phenomena that is "**complete, neutral, and free from error**." [Emphasis in the original.] CON 8, Ch. 3 ¶ QC12. To be free from error does not mean perfectly accurate in all respects; instead,

it means that "there are no errors or omissions in the description of the phenomenon, and the process used to produce the reported information was selected and applied with no errors in the process." CON 8, Ch. 3 ¶ QC15.

95.    Accounting for Debt Issuance Costs - As alleged in further detail below, Beyond Meat reported the value of certain debt issuance costs in connection with the Exchange Transaction in earnings press releases and in its quarterly and annual filings with the SEC on forms 10-Q and 10-K, respectively.

96.    "A restructuring of a debt constitutes a troubled debt restructuring if the creditor for economic or legal reasons related to the debtor's financial difficulties grants a concession to the debtor that it would not otherwise consider." ASC 470-60-20. Under normal debt accounting, issuance costs are capitalized as a debt discount and amortized. ASC 835-30-45-1A and ASC 835-30-45-3. However, under troubled debt restructuring accounting, all costs must be either deducted in measuring gain on restructuring or expensed immediately as incurred. ASC 470-60-35-12.

97.    Accounting for Long-Lived Assets. As alleged in more detail below, throughout the Relevant Period Beyond Meat reported the value of its long-lived assets in earnings press releases and in its quarterly and annual filings with the SEC on forms 10-Q and 10-K, respectively.

98.    ASC 360, Property, Plant, and Equipment, is the authoritative accounting standard which governs the accounting for long-lived assets, including evaluation of these assets for impairment. Impairment is the condition that exists when the carrying amount of a long-lived asset (asset group) exceeds its fair value. ASC 360-10-20.

99.    Long-lived assets (asset group) are subject to two accounting models for assessing their carrying amounts: (1) assets to be held and used and (2) assets to be disposed of by sale (i.e., held for sale). ROU assets should follow the same impairment guidance as other long-lived assets. ASC 842-20-35-9.

100.    Long-lived assets (asset group) classified as held and used, should be tested for impairment whenever events or changes in circumstances indicate that the

carrying amount of the asset group may not be recoverable. ASC 360-10-35-21. GAAP provides the following (non-exclusive) examples of such events or changes in circumstances:

•A significant decrease in the market price of a long-lived asset (asset group).

•A significant adverse change in the extent or manner in which a long-lived asset (asset group) is being used or in its physical condition.

•A significant adverse change in legal factors or in the business climate that could affect the value of a long-lived asset (asset group), including an adverse action or assessment by a regulator.

•An accumulation of costs significantly in excess of the amount originally expected for the acquisition or construction of a long-lived asset (asset group)

•A current-period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with the use of a long-lived asset (asset group).

•A current expectation that, more likely than not, a long-lived asset (asset group) will be sold or otherwise disposed of significantly before the end of its previously estimated useful life. The term more likely than not refers to a level of likelihood that is more than 50 percent. ASC 360-10-35-21.

101.    The first step in the impairment test is to determine whether the long-lived assets are recoverable, which is determined by comparing the net carrying value of the asset group to the entity-specific, undiscounted net cash flows to be generated from the use and eventual disposition of that asset group. ASC 360-10-35-17. This is commonly referred to as the recoverability test.

102.    If the assets are not recoverable (i.e., the net carrying value of the asset group exceeds the undiscounted net cash flows), an impairment loss should be recognized based on the amount by which the carrying value of the asset group exceeds its fair value. ASC 360-10-35-17. Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between

market participants at the measurement date. ASC820-10-20 and ASC 820-10-35-3.

103.   Long-lived assets (asset group) should continue to be classified as held and used until they have met the following held for sale requirements:

•Management, having the authority to approve the action, commits to a plan to sell the asset (disposal group).

•The asset (disposal group) is available for immediate sale in its present condition subject only to terms that are usual and customary for sales of such assets (disposal groups).

•An active program to locate a buyer and other actions required to complete the plan to sell the asset (disposal group) have been initiated.

•The sale of the asset (disposal group) is probable, and transfer of the asset (disposal group) is expected to qualify for recognition as a completed sale, within one year …. The term probable refers to a future sale that is likely to occur.

•The asset (disposal group) is being actively marketed for sale at a price that is reasonable in relation to its current fair value. The price at which a long-lived asset (disposal group) is being marketed is indicative of whether the entity currently has the intent and ability to sell the asset (disposal group). A market price that is reasonable in relation to fair value indicates that the asset (disposal group) is available for immediate sale, whereas a market price in excess of fair value indicates that the asset (disposal group) is not available for immediate sale.

•Actions required to complete the plan indicate that it is unlikely that significant changes to the plan will be made or that the plan will be withdrawn. ASC 360-10-45-9.

104.   Beginning in the period the above held-for-sale criteria are met, a long-lived asset (disposal group) should be classified as held for sale and reported at the lower of its carrying value or fair value less cost to sell. ASC 360-10-45-9 and ASC 360-10-35-43.

105.   The following disclosures are required for impairments of long-lived assets classified as held and used in the period the impairment loss is recognized:

•A description of the impaired long-lived asset (asset group) and the facts and circumstances leading to the impairment.

•If not separately presented on the face of the statement, the amount of the impairment loss and the caption in the income statement or the statement of activities that includes that loss.

35
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

• The method or methods for determining fair value (whether based on a quoted market price, prices for similar assets, or another valuation technique)

• If applicable, the business segment in which the impaired long-lived asset (asset group) is reported. ASC 360-10-50-2

106.    When it is at least reasonably possible that the value of long-lived assets may become impaired in the near term (i.e., the estimates of future cash flows used in the recoverability test or to determine fair value may be particularly sensitive to change) and the effect of the impairment will be material to the financial statements, GAAP requires companies to disclose the nature of the uncertainty of impairment estimate and include an indication that it is at least reasonably possible that a change in the estimate will occur in the near term.

107.    When it is at least reasonably possible that the value of long-lived assets may become impaired in the near term (i.e., the estimates of future cash flows used in the recoverability test or to determine fair value may be particularly sensitive to change) and the effect of the impairment will be material to the financial statements, GAAP requires companies to disclose the nature of the uncertainty of impairment estimate and include an indication that it is at least reasonably possible that a change in the estimate will occur in the near term.

108.    Defendants assured investors that Beyond Meat complied with these requirements. For example, the Company's 2024 10-K represented that: "Long-lived assets are reviewed by management for impairment whenever events or changes in circumstances indicate that the carrying amount of the asset may not be fully recoverable. When events or circumstances indicate that impairment may be present, management evaluates the probability that future undiscounted net cash flows will be less than the asset's carrying amount. If projected future undiscounted cash flows are less than the carrying value of an asset, the asset is written down to its fair value.

109.    In fact, by touting that Defendants conducted impairment analyses annually and whenever circumstances dictated, the 2024 10-K assured investors that Defendants tested impairment of long-lived assets more frequently than what GAAP

required. Indeed, Defendants took pains to underscore this by touting elsewhere in the 2024 10-K that "[w]e perform an asset impairment analysis on an annual basis or whenever events or changes in circumstances indicate that a long-lived asset group may not be recoverable."

### Defendants Act to Address Beyond Meat's Decline

110. Beyond Meat went public on May 2, 2019, at $25.00 per share. Seeking to capitalize on enthusiasm from investors and consumers, which saw the stock surpass $200, Beyond Meat entered into a 12-year $178 million lease of 282,000 square feet of space for its Campus Headquarters on January 14, 2021. In March 2021, the Company issued the 2027 Notes with a face value of approximately $1 billion.

111. By the start of the Relevant Period in February 2025, the Company's revenues had fallen from $465 million in 2021 to $326.5 million in 2024, and only $275 million by the end of 2025, a decline of 40.9%.

112. As Beyond Meat's decline commenced, Defendants assured investors that they had a plan to keep the Company afloat. For example, in November 2023, Defendants initiated a review of Beyond Meat's global operations ("Global Operations Review"). This review included "non-cash charges such as provision for excess and obsolete inventory and potential impairment changes, write-offs, disposals and accelerated depreciation of fixed assets, and losses on sale and write-down of fixed assets; further optimization of [Beyond Meat's] manufacturing capacity and real estate footprint." Defendants emphasized the Global Operations Review in all the Company's Relevant Period SEC filings.

113. Defendants also engaged in numerous headcount reductions to cut costs. In October 2022, Beyond Meat announced layoffs of 200 employees—19% of its staff, due to revenue declines. In November 2023, it announced another 19% cut, or 65 jobs. In February 2025, at the start of the Relevant Period, the Company announced a reduction of 44 people, or 6% of its workforce, followed by another reduction of 44 people in August 2025.

114.   In addition to the Global Operation Review, and headcount reductions, at the start of the Relevant Period, on February 26, 2025, Defendants also announced that, in connection with the Global Operations Review, Beyond Meat's board of directors had approved a plan to cease the Company's operations in China by the end of the second quarter of 2025, and to that end, Defendants had already laid off approximately 95% of the Company's China workforce.

### The Exchange Transfer is Initiated to Save the Company

115.   Despite Defendants' efforts, Beyond Meat's revenues and cash on hand were declining as the 2027 Notes came due. At the start of the Relevant Period, in February 2025, Beyond Meat owed $1.142 billion to bondholders, an amount that would only increase in the months leading up to the bonds' 2027 maturity.

116.   There was no way the Company could pay the bonds—and the market knew it. For example, on a February 26, 2025 call with analysts and investors to discuss the Company's 2024 fourth quarter and full-year performance ("FY24 Call"), an analyst asked Defendant Kutua, "isn't it fair to say that like the convertible, it matures in two years. Is that kind of the timeframe that you have before you do have to do something much more profound?" Defendant Kutua acknowledged that the Notes' looming maturity was an existential threat to the Company, replying, "I mean, we certainly would have to do something within two years…. [W]e said we're going to, in 2025, focus on bolstering the balance sheet, right? And so we're following that plan and we feel pretty good about it."

117.   On September 29, 2025—just after Q3 had ended on September 27, 2025—Defendants issued a press release announcing that the Company had commenced an offer to exchange its 2027 Notes for "(i) up to $202.5 million in aggregate principal amount of its new 7.00% Convertible Senior Secured Second Lien PIK Toggle Notes due 2030...and (ii) up to 326,190,370 shares of its common stock" ("Exchange Transaction"). As described above, virtually all 2027 Noteholders tendered their 2027 Notes prior to October 10.

118. To support their efforts to close the Exchange Transaction, Defendants assured investors throughout the Relevant Period that Beyond Meat's financial reports were accurate and complied with GAAP and that the Company was at risk of only modest write-downs or impairments in connection with the cessation of operations in China.

119. For example, on February 26, 2025, Defendants issued a press release disclosing Beyond Meat's Q4 and FY2024 financial performance ("FY24 Release"). there would be a round of layoffs and that the Company would cease operating in China by the end of the second quarter 2025. Defendants then advised that the Company currently estimated that it would incur "one-time noncash charges of approximately $12.0 million to $17.0 million, primarily related to accelerated depreciation and impairment charges and other write-downs on certain fixed assets in China[,]" "the majority of [which] will be incurred in the first quarter of 2025." Defendants said nothing about any impairment of other long-lived assets.

120. Indeed, on March 5, 2025, Defendants filed Beyond Meat's 2024 10-K, which reported that, as of December 31, 2024, Beyond Meat's consolidated long-lived assets amounted to $308.862 million. Defendants disclosed that none of its long-lived assets were impaired during 2024, and again only cautioned that the Company expected to record between $12 to $17 million in accelerated depreciation and impairment charges related to its planned suspension of operational activities in China.

121. The 2024 10-K expressly attests to the accuracy of these figures in accordance with GAAP and that the Company's accounting controls and procedures were effective both in the report's body and in the sworn certifications appended to the report.

122. Similarly, on May 8, 2025, the Company filed its quarterly report on Form 10-Q with the SEC, reporting Beyond Meat's financial and operating results for its Q1 ended March 29, 2025 (the "Q1 2025 10-Q"). The Q1 2025 10-Q reported that,

as of March 29, 2025, Beyond Meat's consolidated long-lived assets, including PP&E and operating lease ROU assets, amounted to $301.912 million, and that Defendants valued the Company's (i) prepaid expenses and current assets at $19.135 million; (ii) cost of goods sold at $69.796 million; (iii) gross loss at $1.065 million; and (iv) loss from operations at $56.199 million; and (v) net loss at $52.916 million. The Q1 2025 10-Q further disclosed that the Company's gross margin, which Defendants emphasized to investors was one of the Company's "key performance goals," was a negative 1.5%.

123. Like the 2024 10-K, the Q1 2025 10-Q expressly attested to the accuracy of these figures in accordance with GAAP and that the Company's disclosure controls and procedures were effective both in the report's body and sworn certifications appended to the report.

124. Likewise, on August 8, 2025, the Company filed its quarterly report on Form 10-Q with the SEC, reporting Beyond Meat's financial and operating results for its Q2 ended June 28, 2025 (the "Q2 2025 10-Q"). The Q2 2025 10-Q reported that, as of June 28, 2025, the Company's consolidated long-lived assets, including PP&E and operating lease ROU assets, amounted to $327.515 million, and disclosed that Defendants valued the Company's prepaid expenses and current assets at $42.596 million.

125. Like the 2024 10-K and Q1 2025 10-Q, the Q2 2025 10-Q expressly attests to the accuracy of these figures in accordance with GAAP and that the Company's disclosure controls and procedures were effective both in the report's body and in the sworn certifications appended to the report.

126. As a result of these and other disclosures, and Defendants' sworn statements attesting to their accuracy, Defendants were able to save the Company and entice investors to the Company's stock. In the wake of the announcement of the Exchange Transaction, which would massively dilute existing shareholders, the price of the Company's stock plummeted from $2.85 on September 26, 2025, the last

trading day before the Transaction was announced, to only $0.52 cents on October 16, 2025, a decline of 81.75%. Sensing a bargain—and inferring from the 2027 Noteholders' willingness to take equity in exchange for debt that the Company was solvent and truthful in its disclosures—investors ran to invest, and the stock soared to $3.62.

127.    Despite assuring investors that Beyond Meat's financial statements had complied with GAAP and that any charges related to the Company's restructuring efforts had already been accounted for during the first half of 2025, on October 24, 2025, only one week after the Exchange Transaction had effectively been consummated, Defendants filed a current report on Form 8-K with the SEC, reporting the Company's preliminary financial results for Q3 2025 (the "Q3 2025 8-K"), which disclosed that the Company would record and not-yet-quantified, but nevertheless material, impairment charge for long-lived assets during Q3 2025. 99. Days later, on November 3, 2025, during pre-market hours, Defendants issued a press release announcing that Beyond Meat would delay announcing its Q3 2025 results because the Company needed more time to complete the impairment review.

128.    On November 7, 2025, Defendants filed a Notification of Late Filing on Form 12b-25, which disclosed that, when Beyond Meat was eventually able to file its Q3 2025 10-Q, the Company would also disclose that its internal control over financial reporting was ineffective because of a material weakness in the Company's internal control over financial reporting purportedly associated with "accounting for non-recurring and complex transactions."

129.    On November 10, 2025, during post-market hours, Defendants issued a press release reporting Beyond Meat's financial results for Q3 2025 (the "Q3 2025 Earnings Release"). Defendants disclosed that the Company had recorded a $77.4 million impairment charge related to certain of its long-lived assets, including its property, plant, and equipment ("PP&E")—e.g., the Company's equipment and Campus Headquarters—operating lease right-of-use ("ROU"), assets, or prepaid lease

costs.

130. On November 12, 2025, the Company filed its quarterly report on Form 10-Q with the SEC, reporting Beyond Meat's financial and operating results for its Q3 ended September 27, 2025 (the "Q3 2025 10-Q"). In the Q3 2025 10-Q, Defendants reiterated the above disclosure of the $77.4 impairment of long-lived assets, and further disclosed that the material weakness in the Company's internal control over financial reporting was related to "accounting for non-recurring and complex transactions."

131. The Q3 2025 10-Q also included narratives purporting to describe how Defendants identified the impairment of long-lived assets and material weakness. The 10-Q stated that an impairment review was triggered by "lower than expected performance in the three months ended September 27, 2025," "a sustained decline in our stock price, which hit a 52-week low during the third quarter of 2025, resulting in a decrease in market capitalization," and "our determination in the third quarter that the ongoing softness in the plant-based meat category is likely to persist longer than previously anticipated." This purportedly led Defendants to test asset groups where they identified the impairment was recorded.

132. The Q3 2025 10-Q further disclosed that Defendants had identified the material weakness during the Q3 2025 when they were "evaluating the accounting for non-recurring and complex transactions related to compensation, debt, lease and warrant transactions." According to Defendants, Beyond Meat's management had "identified a design and operating deficiency related to our process-level controls associated with the identification and accounting" for non-recurring and complex transactions, and concluded that "inadequate technical resources are currently in place to effectively identify and determine the proper accounting for non-recurring complex transactions."

133. Although the Q3 2025 10-Q and associated press releases purported to disclose the full truth regarding the impaired long-lived assets and the material

weakness in Beyond Meat's internal control over financial reporting, they in fact only told part of the story. The full truth began to emerge, and the risks concealed by Defendants' misstatements began to materialize on March 16, 2026, when Defendants issued a press release disclosing that the Company would not be able to timely file its 2025 annual report because of a second, previously undisclosed, material weakness in the Company's internal control over financial reporting related to inventory valuation.

134.   On March 31, 2026, at the end of the Relevant Period, Defendants finally disclosed the full extent to which Beyond Meat's financial statements had not complied with GAAP as a result of material weaknesses in the Company's internal control over financial reporting.

135.   That day, Defendants issued a press release reporting the Company's FY and Q4 performance (the "FY2025 Release"), which stated that "[d]uring the fourth quarter and full year 2025 financial close procedures, the Company identified errors in its previously issued interim condensed consolidated financial statements for the first three quarters of 2025 relating to (i) inventory valuation, (ii) debt issuance costs, and (iii) the previously disclosed impairment of long-lived assets." Although Defendants state that they had "determined that the errors identified … were immaterial to the previously issued interim period condensed consolidated financial statements," it was clear that the misstatements were material to investors.

136.   For example, Defendants admitted they had overstated the value of the Company's inventory by $5.9 million at the end of Q1, $6.5 million at the end of Q2, and $8.5 million at the end of Q3 2025, and the company should have recorded inventory write-downs in each of these quarters.

137.   In addition, Defendants further disclosed that although GAAP required Beyond Meat to expense $14.1 million of costs for professional services related to the Exchange Transaction on its income statement as "selling, general, and administrative expenses," the Company had capitalized (i.e., recorded as an asset) the $14.1 million on its balance sheet as "prepaid expenses and other current assets."

43
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

138.    Finally, Defendants trumpeted that their initial evaluation of long-lived assets had overstated the impairment by $26.1 million. Nevertheless, Defendants admitted that certain long-lived assets had been impaired by $51.3 million.

139.    As set forth below, Defendants knew or recklessly disregarded the impaired assets and material accounting weaknesses long before they disclosed them to investors, both to ensure that the Exchange Transaction concluded successfully and to entice shareholders to purchase the stock in the wake of the announcement of the transaction.

140.    As set forth above, Defendants asserted that they uncovered impaired long-lived assets and an initial material weakness in or about Q3 2025, then miscategorized Exchange Transaction expenses. However, this is contradicted by Defendants' own disclosures, which demonstrate that they knew or recklessly disregarded that long-lived assets were impaired at least at the start of the Relevant Period, if not earlier.

141.    For example when Defendants belatedly disclosed that long-lived assets were impaired in October and November 2025, they stated that their impairment review was triggered by "lower than expected performance in the three months ended September 27, 2025," "a sustained decline in our stock price, which hit a 52-week low during the third quarter of 2025, resulting in a decrease in market capitalization," and "our determination in the third quarter that the ongoing softness in the plant-based meat category is likely to persist longer than previously anticipated."

142.    This narrative is not credible, however. The events and conditions that Defendants claim triggered Beyond Meat to test its long-lived assets for impairment (lower than expected performance, sustained decline in stock price reaching a 52-week low, and ongoing softness in the plant-based meat category) also existed prior to Q3 2025.

143.    For instance, in the Q1 Release, Defendants stated that Beyond Meat's Q1performance was so poor and its future outlook so uncertain that the Company was

withdrawing its full-year 2025 guidance. It is preposterous to assert that it was not until poor performance in Q3 2025 that an impairment review was triggered.

144. As far as stock price declines are concerned, the Company's stock had reached new 52-week lows multiple times prior to Q3 2025, including: February 27, 2025, March 3, 2025, March 4, 2025, April 3, 2025, April 4, 2025, April 9, 2025, April 15, 2025, April 16, 2025, April 28, 2025, and May 8, 2025.

## False and Misleading Statements

### February 27, 2025 Press Release

145. The Relevant Period began on February 27, 2025, the day after the Company issued a press release announcing its financial results for the fourth quarter of and the year ended 2024 (the "Q4 2024 Press Release"). The Q4 2024 Press Release noted, inter alia, the Company's decision to institute certain "restructuring initiatives, including a reduction-in-force and suspension of operational activities in China, as it targets EBITDA-positive run-rate by the end of 2026[.]" The Q4 2024 Press Release also reported roughly $1.5 million to $2.5 million in total one-time cash charges related to the reduction-in-force and reported that the Company "currently estimates that it will incur one-time non-cash charges of approximately $12.0 million to $17.0 million, primarily related to accelerated depreciation and impairment charges and other write-downs on certain fixed assets in China[,]" "the majority of [which] will be incurred in the first quarter of 2025." Notably, the Q4 2024 Press Release did not identify further anticipated or actual impairment charges pertaining to the Company.

### March 5, 2025 Form 10-K

146. On March 5, 2025, the Company filed the 2024 10-K with the SEC. The 2024 10-K was signed by Defendants Brown, Kutua, Bakhshi, Goldman, Grayson, Jay, Koch, Lane, Murray, and Waller. Attached to the 2024 10-K were certifications made pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Brown and Kutua certifying that the 2024 10-K "fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that the "information contained

in the [2024 10-K] fairly presents, in all material respects, the financial condition and results of operations of [the Company]."

147. The 2024 10-K stated that, as of December 31, 2024, the Company's consolidated long-lived assets, including PP&E and operating lease ROU assets, totaled $308.862 million. The 2024 10-K also stated, in relevant part, the following regarding the impairment of the Company's long-lived assets:

> Long-lived assets are reviewed by management for impairment whenever events or changes in circumstances indicate that the carrying amount of the asset may not be fully recoverable. When events or circumstances indicate that impairment may be present, management evaluates the probability that future undiscounted net cash flows received will be less than the carrying amount of the asset. If projected future undiscounted cash flows are less than the carrying value of an asset, then such assets are written down to their fair values. **The Company concluded that no long-lived assets were impaired during the fiscal years ended December 31, 2024, 2023 and 2022.**

148. Notwithstanding the 2024 10-K's statements set forth in the preceding paragraph, the 2024 10-K purported to warn of risks that "may" or "could" result from certain impairment charges pertaining to ROU assets and prepaid lease costs. To this end, the 2024 10-K stated the following, in relevant part:

> [W]e **may** not be able to build out or occupy the rest of the Campus Headquarters and are considering subleasing, assigning or otherwise transferring the unoccupied space, or negotiating a partial lease termination…. An agreement to partially terminate sublease, assign or otherwise transfer the unoccupied part of the Campus Headquarters would be subject to certain risks and uncertainties. For example, the agreement **may** not be completed on terms advantageous to us because the rental rate we receive under the agreement **may** not fully cover the rental rate we pay under the Campus Lease for the same space or our subtenants **may** fail to make lease payments, **which may result in impairment charges for [ROU] assets** and **prepaid lease costs and could** have a negative impact on our financial condition and results of operations. In addition, a partial termination of the lease **could result in … non-cash write-off of prepaid lease costs**, the amounts of which **could** be material and which **could** have a negative impact on our financial condition and results of operations.

(Emphasis added).

149. In addition, the 2024 10-K downplayed the risks that "may" or "could" occur pertaining more generally to potential impairment charges in the future, while

46
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

at the same time emphasizing the Individual Defendants' asset impairment analyses. The 2024 10-K stated the following, in relevant part:

> The preparation of financial statements in accordance with GAAP involves making estimates, judgments and assumptions that affect reported amounts of assets (including intangible assets), liabilities, revenues and expenses. This includes estimates, judgments and assumptions for assessing the recoverability of our assets .... **If** any estimates, judgments or assumptions change in the future, the Company **may** be required to record additional expenses and/or impairment charges ....
>
> **We base our estimates on historical experience and on various other assumptions that we believe to be reasonable under the circumstances**, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. Our actual results **may** differ from these estimates under assumptions or conditions that **may** change in the future. **While we believe the assumptions and estimates we make are reasonable**, any changes to our assumptions or estimates, or any actual results which differ from our assumptions or estimates, **could** have a material adverse effect on our financial position and operating results.
>
> **We perform an asset impairment analysis on an annual basis or whenever events or changes in circumstances indicate that a long-lived asset group may not be recoverable.** Failure to achieve forecasted operating results, due to weakness in the economic environment or other factors, changes in market conditions and declines in our market capitalization, the planned suspension of our operational activities in China, and failure to negotiate a partial lease termination or sublease, assign or otherwise transfer the unoccupied space of our Campus Headquarters, among other things, **could** result in impairment of our assets and adversely affect our operating results.

(Emphasis added.)

**April 8, 2025 Proxy Statement**

150.   On April 8, 2025, the Company filed the 2025 Proxy Statement with the SEC. Defendants Brown, Bakhski, Goldman, Grayson, Jay, Koch, Lane, Murray, and Waller solicited the 2025 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

151.   The 2025 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) re-elect Defendants Brown, Jay, and Lane to the Board until the 2028 Annual Meeting of the Stockholders; (2) ratify the appointment of Deloitte & Touche LLP as the Company's independent registered public accounting firm for the year

ended December 31, 2025; and (3) approve, on an advisory basis, the compensation of the Company's named executive officers.

152.   Regarding the "Role of the Board in Risk Oversight," the 2025 Proxy Statement stated the following, in relevant part:

> One of the key functions of our board of directors is to oversee our risk management process. The board believes that each director should understand the principal risks associated with the company's business on an ongoing basis and it is the responsibility of management to ensure that the board and its committees are kept well informed of these changing risks on a timely basis. It is important that the board oversees the key risk decisions of management, which includes comprehending the appropriate balance between risks and rewards.

> Our board of directors administers this oversight function directly through our board of directors as a whole, as well as through various committees of our board of directors that address the risks inherent in their respective areas of oversight as described below. Risk assessment and risk management are the responsibility of the company's management. While the board provides the ultimate oversight function over risk assessment and risk management, the risk committee's responsibility in this regard is, along with the audit committee, to provide an initial level of oversight and review and to report to the board of directors on these issues. This risk process includes regular discussions with management about our major risk exposures, their potential impact on our business, and management strategies for adequately mitigating and managing identified risks.

153.   Regarding the Code of Ethics, the 2025 Proxy Statement stated the following:

> We maintain a written code of business conduct and ethics that applies to our directors, officers and employees, including our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions, contractors and consultants. Our code of business conduct and ethics is available under the "Investors" section of our website at https://investors.beyondmeat.com. We intend to disclose future amendments to our code of business conduct and ethics, or any waivers of its requirements, applicable to any principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions, or our directors on the same website. We will also provide a paper copy of our code of business conduct and ethics, free of charge, to any stockholder upon written request to Beyond Meat, Inc., 888 N. Douglas Street, Suite 100, El Segundo, California 90245.

154. The 2025 Proxy Statement was materially false and misleading because it failed to disclose that: (1) several of the Company's long-term assets possessed a book value that exceeded the fair market value of the assets; (2) as a result of the discrepancy between the book value of the Company's long-term assets and their fair market value, the Company would very likely have to record a significant, non-cash impairment charge; (3) as a result of having to record the impairment charge, the Company would be unable to timely file its periodic filings with the SEC; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

155. The 2025 Proxy Statement was also materially false and misleading because, despite assertions to the contrary, the Company's Code of Ethics was not followed, as evidenced by the Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Ethics. Further, the 2025 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

156. As a result of Defendants Brown, Bakhski, Goldman, Grayson, Jay, Koch, Lane, Murray, and Waller causing the 2025 Proxy Statement to be false and misleading, Company shareholders voted to: (1) re-elect Defendants Brown, Jay, and Lane to the Board until the 2028 Annual Meeting of the Stockholders; (2) ratify the appointment of Deloitte & Touche LLP as the Company's independent registered public accounting firm for the year ended December 31, 2025; and (3) approve, on an advisory basis, the compensation of the Company's named executive officers.

**May 7, 2025 Press Release**

157. On May 7, 2025, the Company issued a press release to announce its financial results for the first quarter of 2025 (the "Q1 2025 Press Release"). The Q1 2025 Press Release stated, inter alia, that for the first quarter of 2025, the Company's

loss from operations:

> [I]ncluded the following charges recorded in operating expenses: $4.6 million in incremental legal fees associated with arbitration proceedings related to a previously-disclosed contractual dispute with a former co-manufacturer; $1.3 million in non-cash charges arising from specific strategic decisions to increase inventory provision for donation of certain inventory items; and $1.2 million in expenses related to the suspension of operational activities in China.

158. Notably, the Q1 2025 failed to identify any material impairment charges pertaining to the Company's long-lived assets.

159. In the Q1 2025 Press Release, Defendants also valued the Company's (i) inventory at $100.068 million; (ii) prepaid expenses and current assets at $19.135 million; (iii) prepaid lease costs, non-current at $69.814 million; (iv) cost of goods sold at $69.796 million; (v) gross loss at $1.065 million; and (vi) loss from operations at $56.199 million; and (vii) net loss at $52.916 million.

**May 7, 2025 Earnings Call**

160. That same day, the Company hosted an earnings call to discuss its financial results for the first quarter of 2025 with investors and analysts (the "Ql 2025 Earnings Call"). During the Q1 2025 Earnings Call, an analyst made a comment regarding the Company's one-time charges in the quarter, and asked if the Individual Defendants were aware of "any additional things that are similar to that we should be aware of for the coming couple quarters?" Defendant Brown replied by stating the following, in relevant part:

> **[I]n terms of the sort of one-time items, the only thing that at this point I think that's really worth noting is the China, the costs related to the suspension of our activities in China**. The way we are treating those expenses from an accounting perspective is we are taking accelerated depreciation on those expenses through the end of 2026. **And so each quarter, we will call that out, but each quarter there will be some impact related to that decision.**

**May 8, 2025 Form 10-Q**

161. On May 8, 2025, the Company filed its Quarterly Report on Form 10-Q with the SEC to report its financial and operational results for the period ended March

50
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

29, 2025 (the "Q1 2025 10-Q"). The Ql 2025 10-Q was signed by Defendants Brown and Kutua and contained SOX certifications signed by Defendants Brown and Kutua certifying that the Ql 2025 10-Q "fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that the "information contained in the [Q1 2025 10-Q] fairly presents, in all material respects, the financial condition and results of operations of [the Company]."

162.   In the Q1 2025 10-Q, Defendants valued the Company's (i) inventory at $100.068 million; (ii) prepaid expenses and current assets at $19.135 million; (iii) prepaid lease costs, non-current at $69.814 million; (iv) cost of goods sold at $69.796 million; (v) gross loss at $1.065 million; (vi) loss from operations at $56.199 million; and (vii) net loss at $52.916 million.

163.   The Q1 2025 10-Q also reported that, as of March 29, 2025, the Company's consolidated long-lived assets, including PP&E and operating lease ROU assets, totaled $301.912 million. Additionally, the Q1 2025 10-Q included a boilerplate risk warning section that purported to warn of risks that "may" or "could" result from potential impairment charges in the future. More specifically, the Q1 2025 10-Q stated the following, in relevant part:

> Our substantial investment in manufacturing facilities in China and Europe have exposed and may continue to expose us to substantial risks and, as a result, we may not realize a return on our investment. For example, although we invested a significant amount to establish local operations in China, in February 2025, we made the decision to suspend our operational activities in China. As such, we have not realized a sufficient return on our investment in China and expect to incur certain cash and non-cash charges in connection with the suspension of our operational activities in China in the first quarter of 2025. As a result of our decision to suspend our operational activities in China, we currently estimate that we will incur accelerated depreciation and other inventory and asset write-offs in China totaling $13.0 million to $14.0 million through the end of 2026, of which $1.5 million in accelerated depreciation related to the reassessment of useful lives of certain assets was recognized in the first quarter of 2025, and the remainder of which is expected to be evenly distributed beginning in the second quarter of 2025 through the end of the fourth quarter of 2026 ....

> Unforeseen delays in the suspension of our operational activities in China may cause us to incur additional expenses. Operating or otherwise repurposing or disposing of our facilities in China may require additional

capital expenditures and the efforts and attention of our management team and other personnel, which will divert resources from our existing business or operations. In addition, our manufacturing facility in Enschede, the Netherlands may not provide us with all of the operational and financial benefits we expect to receive. These and other risks may result in our not realizing a return on, or losing some or all, of our investments in China and Europe, which could have a material adverse effect on our financial condition and financial performance.

**August 6, 2025 Press Release**

164.   On August 6, 2025 the Company issued a press release to announce its financial results for the second quarter of 2025 (the "Q2 2025 Press Release"). The Q2 2025 Press Release noted that the Company's loss from operations:

[I]ncluded the following charges recorded in operating expenses: $4.5 million in certain non-routine SG&A [selling, general, and administrative] expenses; $2.5 million in incremental legal expenses associated with arbitration proceedings related to a previously-disclosed contractual dispute with a former co-manufacturer; and $0.5 million in costs related to a partial lease termination of a portion of the Company's campus headquarters building in El Segundo, California[.]

165.   Notably, the Q2 2025 Press Release failed to note any material impairment charge associated with the Company's long-lived assets.

**August 6, 2025 Earnings Call**

166.   That same day, the Company hosted an earnings call to discuss its financial results for the second quarter of 2025 with investors and analysts (the "Q2 2025 Earnings Call"). During the Q2 2025 Earnings Call, Defendant Brown discussed the Company's purported focus on optimizing and achieving EBITDA-positive operations, "[m]any of" which he described "as an acceleration of existing priorities," that likely involved and would continue to involve an assessment of the carrying values of such operations. More specifically, Defendant Brown stated, in relevant part:

To stabilize our business and with a goal to achieve EBITDA positive operations within the second half of 2026 and to realize our much longer-term objective of reshaping global protein markets in support of a healthier and more sustainable future, we are taking significant and immediate actions.

**Many of these, which I enumerate below, you will recognize as an acceleration of existing priorities.**

One, we are welcoming John Boken of AlixPartners as interim Chief Transformation Officer to lead and support **our enterprise-wide transformation activities with a focus on operating expense reduction, gross margin expansion and broader operational efficiency**.

Two, **we are intensifying expense reduction globally to fit our operating base into the existing near-term opportunity.** These measures include a reduction in force that we performed today.

\* \* \*

Three, **we are deepening each of our gross margin expansion activities, including continuing to optimize our portfolio by** exiting certain product lines and reconfiguring others, **making additional investments in our** facilities **around core production lines and select others where we see opportunities to significantly reduce costs**, working within our supply chain to reduce raw ingredient prices and logistics costs **and further fitting our production operations to current demand levels** so as to realize gross margin recovery even under lower volumes.

**August 8, 2025 Form 10-Q**

167.   On August 8, 2025, the Company filed its Quarterly Report on Form 10-Q with the SEC for the period ended June 28, 2025 (the "Q2 2025 10-Q"). The Q2 2025 10-Q was signed by Defendants Brown and Kutua, and contained SOX certifications signed by Defendants Brown and Kutua certifying that the Q2 2025 10-Q "fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that the "information contained in the [Q2 2025 10-Q] fairly presents, in all material respects, the financial condition and results of operations of [the Company]."

168.   The Q2 2025 10-Q reported that, as of June 28, 2025, the Company's consolidated long-lived assets, including PP&E and operating lease ROU assets, totaled $327.515 million. The Q2 2025 10-Q also purported to warn of risks that "may" or "could" result from the Company's leasing arrangements. More specifically, the Q2 2025 10-Q stated the following, in relevant part:

Underutilization or cessation of our manufacturing facilities **could** adversely affect our gross margin and other operating results and we **may** be required to ... write down our long-lived assets, or shorten the useful lives and accelerate depreciation of our assets[.]

* * *

We may not be able to build out or occupy the rest of the Campus Headquarters and are considering subleasing, assigning or otherwise transferring additional unoccupied space, or negotiating further partial lease terminations but may be unable to enter into or negotiate such an agreement or partial termination, which could have an adverse effect on our operating and financial results. An agreement to partially terminate, sublease, assign or otherwise transfer the unoccupied part of the Campus Headquarters would be subject to certain risks and uncertainties. For example, the agreement may not be completed on terms advantageous to us [and] ... may result in impairment charges for [ROU] assets and prepaid lease costs and could have a negative impact on our financial condition and results of operations. In addition, a partial termination of the lease could result in a penalty payment to exit the lease and non-cash write-off of prepaid lease costs, the amounts of which could be material and which could have a negative impact on our financial condition and results of operations.

169. In the Q2 2025 Release, Defendants also valued the Company's (i) inventory at $110.868 million and (ii) prepaid expenses and other current assets at $42.596 million.

**November 10, 2025 Press Release**

170. On November 10, 2025, Beyond Meat issued a press release reporting its financial results for Q3 2025. In the Q3 2025 Release, Defendants valued the Company's (i) inventory at $110.294million; (ii) prepaid expenses and other current assets at $31.048million; and (iii) gross profit at $7.230 million.

**November 12, 2025 Form 10-Q**

171. On November 12, 2025, Beyond Meat filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its Q2 ended September 27, 2025 (the "Q3 2025 10-Q"). The Q3 2025 10-Q was signed by Defendants Brown and Kutua and contained SOX certifications signed by Defendants Brown and Kutua certifying that the Q3 2025 10-Q "fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that the "information contained in the [Q3 2025 10-Q] fairly presents, in all material respects, the financial condition and results of operations of [the Company]."

172. In the Q3 2025 10-Q, Defendants valued the Company's (i) inventory at

$100.294 million; (ii) prepaid expenses and current assets at $31.048 million; and (iii) gross profit at $7.230 million.

173. The statements in ¶¶147-151, ¶159, ¶¶162-163; ¶¶165-166-, and ¶¶ 168-170 were materially false and misleading at the time they were made because they failed to disclose that: (1) several of the Company's long-term assets possessed a book value that exceeded the fair market value of the assets; (2) as a result of the discrepancy between the book value of the Company's long-term assets and their fair market value, the Company would very likely have to record a significant, non-cash impairment charge; (3) as a result of having to record the impairment charge, the Company would be unable to timely file its periodic filings with the SEC; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

174. Similarly the statements in ¶¶161, ¶164, ¶¶171-172, and ¶ 174 were materially false and misleading at the time they were made because they failed to disclose that when expenses related to the Exchange Transaction were properly accounted for the prepaid expenses and other current assets were overstated.

**The Truth Begins to Emerge as the False and Misleading Statements Continue**

**October 24, 2025 Form 8-K**

175. The truth began to emerge on October 24, 2025, before the market opened, when the Company filed Form 8-K for that date with the SEC. The October 24, 2025, Form 8-K noted that the Company expected to record a "material," indeterminable non-cash impairment charge pertaining to its long-lived assets. The October 24, 2025 Form 8-K stated the following, in relevant part:

> **[T]he Company expects to record a non-cash impairment charge for the three months ended September 27, 2025, related to certain of its long-lived assets**. The Company's recoverability test ... preliminarily indicated that the carrying amount of certain of its long-lived assets was not recoverable from the projected undiscounted future cash flows of the relevant asset group. **Although the impairment charge is expected to be material, the Company is not yet able to reasonably quantify the**

**amount at this time.**

176.    The October 24, 2025, Form 8-K generated immediate and significant attention from analysts and other media outlets. For instance, on October 24, 2025, the Wall Street Journal published an article titled "Beyond Meat Expects Impairment Charge, Revenue In Line With Target," which reported that the Company "anticipated a noncash impairment charge tied to some long-lived assets" that "it expects ...to be material," but "can't yet quantify."[2] On the same day, Benzinga published an article titled "Beyond Meat Stock Slips, Traders Chew On Q3 Estimates," which stated that the "Beyond Meats also expects a large non-cash impairment, meaning the book value of some long-term assets (factories, equipment, etc.) is higher than what they're worth and those assets must be 'written down.'"[3]

177.    On this news, the price per share of the Company's common stock fell roughly $0.65 per share, or approximately 23.06%, from a closing price of $2.84 per share at the close of trading on October 23, 2025, to close at approximately $2.19 per share on October 24, 2025. However, despite this partial emergence of the truth, the Individual Defendants continued to make false and misleading statements to investors.

**November 3, 2025 Press Release**

178.    On November 3, 2025, before the market opened, the Company issued the Q3 2025 Untimely Filing Notice. The Q3 2025 Untimely Filing Notice noted that the Company required additional time to complete the impairment review. More specifically, the Q3 2025 Untimely Filing Notice stated the following, in relevant part:

---

[2] Robb M. Stewart, *Beyond Meat Expects Impairment Charge, Revenue In Line With Target*, THE WALL STREET JOURNAL (Oct. 24, 2025, 8:58 AM), https://www.wsj.com/business/retail/beyond-meat-expects-impairment-charge-revenue-in-line-with-target-b484c86f?reflink=desktopwebshare_permalink.

[3] Erica Kollmann, *Beyond Meat Stock Slips*, Traders Chew On Q3 Estimates, BENZINGA (Oct. 24, 2025, 12:43 PM), https://www.benzinga.com/trading-ideas/movers/25/10/48411376/beyond-meatstock-slips-traders-chew-on-q3-estimates.

> Beyond Meat ... is rescheduling the reporting of its financial results for the third quarter ended September 27, 2025 to Tuesday, November 11, 2025 after market close.
>
> As previously disclosed on Form 8-K filed on October 24, 2025, the Company expects to record a non-cash impairment charge for the three months ended September 27, 2025 related to certain of its long-lived assets. Although the Company expects this charge to be material, the Company is not yet able to reasonably quantify the amount, and requires additional time, resources and effort to finalize its assessment, and therefore is rescheduling its previously-announced conference call to Tuesday, November 11, 2025.

179. Analysts and media outlets were swift to take note of the disclosures in the Q3 2025 Untimely Filing Notice. For instance, that same day, the media outlet Bloomberg Law published an article titled "Beyond Meat Shares Fall as Impairment Charge Delays 3Q Results," which stated that "Beyond Meat shares are down 8.2% in premarket trading after the plant-based protein company postponed the release of its 3Q results to Nov. 11 as it finalizes an assessment of a material non-cash impairment charge tied to certain long-lived assets."[4]

180. Reuters also published an article on November 3, 2026, titled "Beyond Meat Delays Quarterly Earnings Report to November 11," which reported that Beyond Meat "is delaying its third-quarter results report by a week as it requires more time to quantify an impairment charge related to some of its assets, sending its shares about 12% lower in early trading on Monday."[5]

181. On this news, the price per share of the Company's common stock fell roughly $0.27, or approximately 16.01%, from a closing price of approximately $1.66 per share at the close of trading on November 2, 2025, to close at $1.39 per share on

---

[4] Georgi Azar and Peyton Forte, Beyond Meat Shares Fall as Impairment Charge Delays 3Q Results, BLOOMBERG LAW (Nov. 3, 2025, 9:07 AM), https://news.bloomberglaw.com/bankruptcy-law/beyond-meat-delays-3q-results-sees-impairment-charge.

[5] Neil J. Kanatt and Leroy Leo, Beyond Meat delays quarterly earnings report to November 11, REUTERS (Nov. 3, 2025, 9:41 AM), https://www.reuters.com/business/beyond-meat-delays-quarterly-earnings-report-november-11-2025-11-03/.

November 3, 2025.

**November 10, 2025 Press Release**

182.   The truth continued to emerge on November 10, 2025, when, after the market closed, the Company issued the Q3 2025 Press Release. The Q3 2025 Press Release stated, that the Company's loss from operations for the quarter "was $112.3 million, or operating margin of -160.0%, compared to loss from operations of $30.9 million, or operating margin of -38.2%, in the year-ago period[,]" which "included $77.4 million in non-case impairment charges related to certain of the Company's long-lived assets."

183.   On this news, the price per share of the Company's common stock fell $0.12, or approximately 8.96%, from a closing price of approximately $1.34 per share at the close of trading on November 10, 2025 to close at $1.22 per share on November 11, 2025.

**November 11, 2025 Earnings Call**

184.   The truth continued to emerge on November 11, 2025, when, after the market closed, the Company hosted the Q3 2025 Earnings Call. During the Q3 2025 Earnings Call, Defendant Kutua stated, in relevant part, that "[t]he total impairment amount of $77.4 million was ... allocated to PP&E, operating lease ROU assets and prepaid lease costs on our balance sheet."

185.   On this news, the price per share of the Company's common stock fell roughly $0.10, or approximately 8.61%, from a closing price of $1.22 per share at the close of trading on November 11, 2025, to close at approximately $1.12 per share on November 12, 2025.

## SUBSEQUENT DEVELOPMENTS

186.   Analysts and media outlets were once again swift to take notice of the Company's disclosures. For instance, on November 10, 2025, the online publication *Stocktwits* published an article titled "Is Beyond Meat's 'Meme' Moment Over? Stock Plunges After-Hours As $81M Charge, Shrinking Sales Dent Sentiment," which

stated that Beyond Meat's "shares tumbled 9% in after-hours trading on Monday after the company's quarterly report revealed ... a significant impairment charge."[6]

187.   In addition, the online publication The Motley Fool published an article on November 11, 2025, titled "No Bottom in Sight for Beyond Meat's Crashing Sales," which stated, in relevant part, that the "impairment charge of $77.4 million against long-lived assets in the third quarter …dragged down the [Company's] bottom line."[7]

188.   The truth continued to emerge and concealed risks continued to materialize on March 16, 2026, when the Defendants belatedly disclosed that the filing of its Annual Report on Form 10-K for the 2025 Fiscal Year would be delayed "because the Company requires additional time to complete a review and analysis related to its inventory balances, including amounts recorded for the provision of excess and obsolete inventory....As a result of these issues, management expects to report that a material weakness in the Company's internal control over financial reporting existed as of December 31, 2025, related to controls associated with the accounting for its inventory provision."

189.   Following Defendants' disclosure of the second material weakness, Beyond Meat's stock price fell an additional $0.06 per share, or 7.37%, to close at $0.75per share on March 17, 2026.

190.   The truth fully emerged and the concealed risks fully materialized on March 31, 2026, when, after the close of trading, Defendants issued a press release

---

[6] Yuvraj Malik, *Is Beyond Meat's 'Meme' Moment Over? Stock Plunges After-Hours As $81M Charge, Shrinking Sales Dent Sentiment*, STOCKTWITS (Nov. 10, 2025, 9:24 PM), https://stocktwits.com/news-articles/markets/equity/is-beyond-meat-s-meme-moment-over-stock-plunges-after-hours-as-8l-m-charge-shrinking-sales-dent-sentiment/cLPdB25RE2A.

[7] Timothy Green, *No Bottom in Sight for Beyond Meat's Crashing Sales*, THE MOTLEY FOOL (Nov. 11, 2025, 8:48AM), https://www.fool.com/investing/2025/11/11/no-bottom-in-sight-for-beyond-meats-crashing-sales/?msockid=308cd062f6cb62d327f3c778f7c26365.

belatedly reporting the Company's fourth quarter and full year 2025 financial results ("FY25 Earnings Release").

191.   Among other things, the FY25 Earnings Release disclosed that Beyond Meat's quarterly financial statements for the first three fiscal quarters of 2025 contained material misstatements, including that (i) Defendants had misclassified $14.1 million in expenses related to the Exchange Transaction as assets, not expenses; and (ii) the $77.4 impairment of long-lived assets disclosed in November 2025 was overstated by $26.1 million.

192.   In addition, the FY25 Earnings Release further disclosed that although GAAP required Beyond Meat to record  $14.1 million of costs for professional services related to the Exchange Transaction on its income statement as "selling, general, and administrative expenses," Defendants had capitalized the $14.1 million on its balance sheet as "prepaid expenses and other current assets,", which had the effect  of understating the Company's loss from operations by 2.0%, or $2.3 million, in Q1 2025 and 5.3%, or $1.9 million in Q2 2025, as well as failing to properly record $9.9 million expenses in Q3 2025, which represented 8.8% of the $122.3 million loss from operations the Company initially reported, and 21.1% of the loss from operations the Company ultimately reported.

193.   Following Defendants' disclosure of their false statements in each of the first three quarters of 2025, Beyond Meat's stock price fell an additional $0.08 per share, or 11.57%, to close at $0.62per share on April 1, 2026.

## **DAMAGES TO BEYOND MEAT**

194.   As a direct and proximate result of the Individual Defendants' conduct, Beyond Meat has lost and will continue to lose and expend many millions of dollars.

195.   Such expenditures include, but are not limited to, legal fees, costs, and any payments for the resolution of or to satisfy a judgment associated with the Securities Class Action or any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to

outside lawyers, accountants, and investigators in connection thereto.

196.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

197.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company, including lucrative insider trading conducted by three of the Individual Defendants.

198.    As a direct and proximate result of the Individual Defendants' conduct, Beyond Meat has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and the Individual Defendants' misrepresentations.

## DERIVATIVE ALLEGATIONS

199.    Plaintiffs bring this action derivatively and for the benefit of Beyond Meat to redress injuries suffered, and to be suffered, because of, *inter alia*, the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Beyond Meat, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

200.    Beyond Meat is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

201.    Plaintiffs are, and have been at all relevant times, shareholders of Beyond Meat. Plaintiffs will adequately and fairly represent the interests of Beyond Meat in enforcing and prosecuting its rights, and, to that end, have retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

202.    Plaintiffs incorporate by reference and reallege each and every allegation stated above as if fully set forth herein.

203.    A pre-suit demand on the Board is futile and, therefore, excused. At the time of the filing of this action, Beyond Meat's Board consists of the following nine individuals: Defendants Goldman, Grayson, Jay, Koch, Lane, Murray, Waller (the "Director-Defendants") and non-parties Alexandre Zyngier and Raphael Thomas Wallander (collectively with the Director-Defendants, the "Directors"). Plaintiffs need only allege demand futility as to five of the nine Directors that were on the Board at the time this action was filed.

204.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

205.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Beyond Meat to issue materially false and misleading statements. Specifically, the Director-Defendants caused Beyond Meat to issue false and misleading statements, which were intended to make Beyond Meat appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

206.    Demand on Defendant Goldman is also futile for the following reasons. Defendant Goldman has served as a Company director since February 2013 and as

Chairman of the Board since February 27, 2020. Defendant Goldman previously served as the Company's Executive Chairman of the Board from October 2015 to February 27, 2020. Defendant Goldman also currently serves on the Nominating and Corporate Governance Committee. In addition, Defendant Goldman receives compensation for his role as Chairman of the Board. As the Company's trusted Chairman of the Board, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Goldman also signed the materially false and misleading 2024 10-K and solicited the false and misleading 2025 Proxy Statement, which led to, *inter alia*, shareholders voting to re-elect Defendants Brown, Jay, and Lane to the Board to serve until the 2028 Annual Meeting of the Shareholders. For these reasons, too, Defendant Goldman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus any demand upon him is futile and therefore excused.

207. Demand on Defendant Grayson is also futile for the following reasons. Defendant Grayson has served as a Company director since May 2024. Defendant Grayson also currently serves as the Chair of the Risk Committee and as a member of the Nominating and Corporate Governance Committee. In addition, Defendant Grayson receives compensation from the Company for her role as a director. As a trusted director, she exercised little, if any, oversight of the scheme that caused the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Also, Defendant Grayson signed the materially false and misleading 2024 10-K and solicited the materially false and misleading 2025 Proxy Statement, which led, *inter alia*, to shareholders voting to re-elect Defendants Brown, Jay, and Lane to the Board to serve until the 2028 Annual Meeting of the Shareholders. Her insider sales during the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Relevant Period, where she netted proceeds of roughly $28,239, further demonstrate her motive in facilitating and participating in the scheme. For these reasons, too, Defendant Grayson breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus any demand upon her is futile and therefore excused.

208. Demand on Defendant Jay is also futile for the following reasons. Defendant Jay has served as a Company director since May 2022. Defendant Jay currently serves as the Chair of the Human Capital Management and Compensation Committee and as a member of the Risk Committee. In addition, Defendant Jay receives compensation from the Company for her role as a director. As a trusted director, she conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Also, Defendant Jay signed the materially false and misleading 2024 10-K and solicited the materially false and misleading 2025 Proxy Statement, which led to shareholders voting to re-elect Defendants Brown, Lane, and herself to the Board to serve until the 2028 Annual Meeting of the Shareholders. For these reasons, too, Defendant Jay breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and therefore excused.

209. Demand on Defendant Koch is also futile for the following reasons. Defendant Koch has served as a Company director since May 2023 and currently serves on the Risk Committee. In addition, Defendant Koch receives compensation from the Company for his role as a director. As a trusted director, he exercised little, if any, oversight of the schemes that caused the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant Koch also signed the materially false and

64
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

misleading 2024 10-K and solicited the materially false and misleading 2025 Proxy Statement, which led to shareholders voting to re-elect Defendants Brown, Jay, and Lane to the Board to serve until the 2028 Annual Meeting of the Shareholders. For these reasons, too, Defendant Koch breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus any demand upon him is futile and therefore excused.

210. Demand on Defendant Lane is also futile for the following reasons. Defendant Lane has served as a Company director since February 2015 and currently serves on the Human Capital Management and Compensation Committee. In addition, Defendant Lane receives handsome compensation from the Company for his role as a director. As a trusted director, he conducted little, if any, oversight of the schemes to cause the Company to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant Lane also signed the materially false and misleading 2024 10-K and solicited the materially false and misleading 2025 Proxy Statement, which led to shareholders voting to re-elect Defendants Brown, Jay, and himself to the Board to serve until the 2028 Annual Meeting of the Shareholders. For these reasons, too, Defendant Lane breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus any demand upon him is futile and therefore excused.

211. Demand on Defendant Murray is also futile for the following reasons. Defendant Murray has served as a Company director since May 2024. Defendant Murray currently serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. In addition, Defendant Murray receives handsome compensation from the Company for his role as a director. As a trusted director, he conducted little, if any, oversight of the schemes to cause the Company to make and/or cause the Company to make false and misleading

statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant Murray also signed the materially false and misleading 2024 10-K and solicited the materially false and misleading 2025 Proxy Statement, which led shareholders to vote to re-elect Defendants Brown, Jay, and Lane to the Board to serve until the 2028 Annual Meeting of the Shareholders. For these reasons, too, Defendant Murray breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

212.   Demand on Defendant Waller is also futile for the following reasons. Defendant Waller has served as a Company director since November 2018. Defendant Waller currently serves as the Chair of the Audit Committee and as a member of the Human Capital Management and Compensation Committee. In addition, Defendant Waller receives handsome compensation from the Company for her role as a director. As a trusted director, she conducted little, if any, oversight of the schemes to make and/or cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Defendant Waller also signed the materially false and misleading 2024 10-K and solicited the materially false and misleading 2025 Proxy Statement, which led shareholders to vote to re-elect Defendants Brown, Jay, and Lane to the Board to serve until the 2028 Annual Meeting of the Shareholders. For these reasons, too, Defendant Waller breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus any demand upon her is futile and therefore excused.

213.   Demand on the Board is also futile for the following additional reasons. Defendants Waller (as Chair) and Murray served as members of the Audit Committee at all relevant times (collectively, the "Audit Committee Defendants"). As such, they

were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Ethics. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

214. In violation of the Code of Ethics, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Ethics, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics. Thus, the Director-Defendants face a substantial likelihood of liability, and demand is futile as to them.

215. Beyond Meat has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for that wrongful conduct to attempt to recover for Beyond Meat any part of the damages Beyond Meat suffered and will continue to suffer thereby. Thus, any demand upon

the Director-Defendants would be futile.

216. The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment, as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

217. The acts complained of herein constitute violations of fiduciary duties owed by Beyond Meat's officers and directors, and these acts are incapable of ratification.

218. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Beyond Meat. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Beyond Meat, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as in this action, such insurance coverage, if any, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

219. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Beyond Meat to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

220. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against Defendants Brown, Bakhski, Goldman, Grayson, Jay, Koch, Lane, Murray, and Waller for Violations of Section 14(a) of the Exchange Act

221. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

222. The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiffs specifically disclaim any allegations of reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these non-fraud claims.

223. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(l), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 781]."

224. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act,

provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

225. The 2025 Proxy also stated the Company's directors, officers, and employees are subject to the Company's Code of Conduct. However, under the direction and watch of Defendants Brown, Bakhski, Goldman, Grayson, Jay, Koch, Lane, Murray, and Waller, the 2025 Proxy Statement failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2025 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

226. The 2025 Proxy Statement also failed to disclose, *inter alia*, that: (1) several of the Company's long-term assets possessed a book value that exceeded the fair market value of the assets; (2) as a result of the discrepancy between the book value of the Company's long-term assets and their fair market value, the Company would very likely have to record a significant, non-cash impairment charge; (3) as a result of having to record the impairment charge, the Company would be unable to timely file its periodic filings with the SEC; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants' statements were materially false and misleading at all relevant times.

227. In the exercise of reasonable care, Defendants Brown, Bakhski, Goldman, Grayson, Jay, Koch, Lane, Murray, and Waller, should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2025 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiffs in voting on matters set

forth for shareholder determination in the 2025 Proxy Statement, including, but not limited to, the re-election of directors.

228.   As a result of Defendants Brown, Bakhski, Goldman, Grayson, Jay, Koch, Lane, Murray, and Waller causing the 2025 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Brown, Jay, and Lane to the Board until the 2028 Annual Meeting of the Stockholders; (2) ratify the appointment of Deloitte & Touche LLP as the Company's independent registered public accounting firm for the year ended December 31, 2025; and (3) approve, on an advisory basis, the compensation of the Company's named executive officers.

229.   The Company was damaged as a result of Defendants Brown's, Bakhski's, Goldman's, Grayson's, Jay's, Koch's, Lane's, Murray's, and Waller's material misrepresentations and omissions in the 2025 Proxy Statement.

230.   Plaintiffs, on behalf of Beyond Meat, have no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants
### for Violations of Section 20(a) of the Exchange Act

231.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

232.   The Individual Defendants, by virtue of their positions with the Company and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Beyond Meat and officers and directors who made the false and misleading statements alleged herein within the meaning of Section 20(a) of the Exchange Act.

233.   The Individual Defendants had the power and influence, and exercised the same, to cause the Company to engage in the illegal conduct and practices complained of herein.

234.   Plaintiff, on behalf of Beyond Meat, has no adequate remedy at law.

## THIRD CLAIM
### Against the Individual Defendants
### Against the Individual Defendants for Breach of Fiduciary Duties

235.  Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

236.  Each Individual Defendant owed to the Company fiduciary obligations, including the duty to exercise candor, good faith, and loyalty in the management and administration of Beyond Meat's business and affairs.

237.  Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision, causing the Company to engage in the misconduct described herein.

238.  The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Beyond Meat.

239.  Also in breach of their fiduciary duties owed to Beyond Meat, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and/or omissions of material fact that failed to disclose that: (1) several of the Company's long-term assets possessed a book value that exceeded the fair market value of the assets; (2) as a result of the discrepancy between the book value of the Company's long-term assets and their fair market value, the Company would very likely have to record a significant, non-cash impairment charge; (3) as a result of having to record the impairment charge, the Company would be unable to timely file its periodic filings with the SEC; and (4) the Company failed to maintain internal controls. Additionally, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and/or omissions of material fact that failed to disclose that when expenses related to the Exchange Transaction were properly accounted for, the prepaid expenses and

other current assets were overstated. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

240. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

241. Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

242. In yet further breach of their fiduciary duties, during the Relevant Period, while the Company's common stock was at artificially inflated prices before the fraud was exposed, three of the Individual Defendants engaged in lucrative insider sales, netting combined proceeds of approximately $243,172.

243. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Beyond Meat's securities.

244. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the

fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Beyond Meat's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

245.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

246.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Beyond Meat has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

247.   Plaintiffs, on behalf of Beyond Meat, have no adequate remedy at law.

## THIRD CLAIM
### Against the Individual Defendants for Unjust Enrichment

248.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

249.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Beyond Meat.

250.   The Individual Defendants either benefitted financially from improper conduct, or received bonuses, stock options, or similar compensation from Beyond Meat that was tied to the performance or artificially inflated valuation of Beyond Meat, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

251.   Plaintiffs, as shareholders and representatives of Beyond Meat, seek restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

252.   Plaintiffs, on behalf of Beyond Meat, have no adequate remedy at law.

## FOURTH CLAIM
### Against the Individual Defendants for Abuse of Control

253.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

254.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Beyond Meat, for which they are legally responsible.

255.   As a direct and proximate result of the Individual Defendants' abuse of control, Beyond Meat has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

256.   Plaintiffs, on behalf of Beyond Meat, have no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

257.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

258.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Beyond Meat in a manner consistent with the operations of a publicly held corporation.

259.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Beyond Meat has sustained and

will continue to sustain significant damages.

260. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

261. Plaintiffs, on behalf of Beyond Meat, have no adequate remedy at law.

## SIXTH CLAIM
### Against Individual Defendants for Waste of Corporate Assets

262. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

263. The Individual Defendants caused the Company to pay the Individual Defendants' excessive salaries and fees, to the detriment of the shareholders and the Company.

264. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Beyond Meat to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

265. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

266. Plaintiffs, on behalf of Beyond Meat, have no adequate remedy at law.

## SEVENTH CLAIM
### Against Defendants Brown and Kutua for Contribution and Indemnification Under Sections 10 (b) and 21D of the Exchange Act

267. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

268. Beyond Meat and Defendants Brown and Kutua are named as defendants in the Securities Class Action, which asserts claims under the federal securities law for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5

promulgated thereunder. If and when the company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Brown's and Defendant Kutua's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

269.    Defendants Brown and Kutua, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

270.    Accordingly, Defendants Brown and Kutua are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

271.    As such, Beyond Meat is entitled to receive all appropriate contribution or indemnification from Defendants Brown and Kutua.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiffs demand judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiffs may maintain this action on behalf of Beyond Meat, and that Plaintiffs are adequate representatives of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Beyond Meat;

(c) Determining and awarding to Beyond Meat the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Beyond Meat and the Individual Defendants to take all

necessary actions to reform and improve Beyond Meat's corporate governance and internal procedures to comply with applicable laws and protect Beyond Meat and its shareholders from a repeat of the damaging events described herein;

(e) Awarding Beyond Meat restitution from Individual Defendants, and each of them ordering disgorgement of all profits, benefits, and other compensation obtained by Individual Defendants;

(f) Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: June 4, 2026

By:   */s/Eric Lechtzin*
Eric Lechtzin (SBN 248958)
elechtzin@edelson-law.com
**EDELSON LECHTZIN LLP**
411 S. State Street, Suite N-300
Newtown, PA 18940
Telephone: (215) 867-2399
Phone: 215-867-2399
Facsimile: (949) 340-3000

*Attorneys for Plaintiffs*

78
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## VERIFICATION

I, Koushalram Kumaran, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to the allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and believe them to be true.

I declare under the penalty of perjury that the foregoing is true and correct.


Date:   06 / 04 / 2026                    _____

                                          Koushalram Kumaran

# **VERIFICATION**

I, Nicky Perrow, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to the allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and believe them to be true.

I declare under the penalty of perjury that the foregoing is true and correct.

Date: 06 / 02 / 2026

_____
Nicky Perrow